# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| | ) |
| R&G FINANCIAL CORPORATION, | ) |
| | ) **Case No. 10-04124 (ESL)** |
| XXX-XX2217 | ) |
| | ) Obj. Deadline: October 25, 2010 at 4:00 p.m. prevailing Atlantic Time |
| Debtor. | ) |
| | ) Hearing Date: Only if necessary and as scheduled by the Bankruptcy Court |

## WILMINGTON TRUST COMPANY'S MOTION FOR DERIVATIVE STANDING TO INVESTIGATE, ASSERT AND PROSECUTE CLAIMS AGAINST OFFICERS AND DIRECTORS, AND AUTHORITY TO HOLD, ASSERT, AND IF NECESSARY, WAIVE CERTAIN PRIVILEGES ON BEHALF OF THE ESTATE

Wilmington Trust Company, in its capacity as trustee for R&G Capital Trusts III, V and VI ("WTC"), submits to this Court Wilmington Trust Company's Motion for Derivative Standing to Investigate, Assert and Prosecute Claims Against Officers and Directors, and Authority to Hold, Assert, and if Necessary, Waive Certain Privileges on Behalf of the Estate (the "Motion"), pursuant to which it seeks an order granting WTC: (i) standing to investigate, assert and prosecute any and all claims that are property of the bankruptcy estate (the "Estate") of R&G Financial Corporation (the "Debtor") against current and former officers and directors of the Debtor (the "Claims"), including without limitation Claims covered by the D&O Policies (as defined below), and (ii) authorization to hold, assert, and if necessary, waive certain privileges for the benefit of, and on behalf of, the Estate and its creditors. In support of the Motion, WTC shows this Court as follows:

## BACKGROUND

1. On May 14, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). The Debtor is

operating its business and managing its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed in this case.

2. The Debtor was the direct parent of R-G Premier Bank of Puerto Rico (the "Bank"), through which the Debtor primarily conducted its business.  On April 30, 2010, the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico closed the Bank and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver, thereby necessitating the filing of the instant bankruptcy case.  The FDIC has transferred the Bank's assets and most liabilities to Scotiabank de Puerto Rico.

3. The Debtor's primary assets now consist of potential tax refunds, cash, loan participations, interests in non-debtor subsidiaries other than the Bank, director and officer liability insurance policies, and potential litigation claims.

4. In particular, the Debtor's assets include the following directors and officers liability insurance policies: (i) XL Specialty Insurance Company Policy Number ELU108674-08 (the "Primary D&O Policy"), which contains a $25 million aggregate limit of liability for loss resulting from claims for wrongful acts occurring on or before December 30, 2010 (with certain exceptions), **and pursuant to which claims must be made against the directors and officers on or before December 30, 2010** (absent the purchase of an Extended Reporting Period (as defined therein)); and (ii) XL Specialty Insurance Company Policy Number ELU108668-08 (the "Excess D&O Policy"; together with the Primary D&O Policy, the "D&O Policies"), which contains a $10 million aggregate limit of liability for loss resulting from claims for wrongful acts occurring from November 30, 2007 to December 30, 2010 (with certain exceptions), **and pursuant to which claims must be made against the directors and officers**

**on or before December 30, 2010** (absent the purchase of an Optional Extension Period (as defined therein)).[1]

5. Pursuant to the various documents (the "Trust Documents") associated with the issuance of certain securities (the "Trust Preferred Securities") and the creation of the statutory trusts for which WTC acts as trustee (R&G Capital Trusts III, V and VI), WTC, in its capacity as indenture trustee, represents the interests of the beneficial holders of the Trust Preferred Securities. In accordance with the terms of the Trust Documents, WTC filed proofs of claim totaling not less than $384,996,233.92. Based upon the Debtor's schedules, WTC collectively represents over 90% of the Debtor's unsecured debt. Accordingly, the beneficial holders of the Trust Preferred Securities, whose interests in the bankruptcy case are represented by WTC, are by far the largest group of unsecured creditors in the Debtor's bankruptcy case.

6. Based on the Debtor's financial collapse, the closure of the Bank, and certain information obtained by its counsel, WTC believes that Claims on behalf of the Estate may exist against certain of the Debtor's current and former officers and directors (collectively, the "Insiders"), including without limitation Claims arising from breaches of duties owed by the Insiders to the Debtor or their constituents, misrepresentations, failures to disclose and other wrongful acts.

7. However, the Debtor continues to be influenced, if not controlled, by Insiders who may have engaged in the acts or omissions giving rise to the Claims. In fact, the Debtor's current officers and directors were officers and directors of the Debtor prior to the Petition Date. Such Insiders cannot be expected to cause the Debtor to investigate or pursue the Claims against themselves or other officers or directors with whom they have had relationships. Moreover,

---

[1] Given the potential need to make claims under the D&O Policies on or before December 30, 2010, if a hearing is required on the Motion, WTC asks that the hearing be conducted between October 27, 2010 and October 29, 2010 or between November 2, 2010 and November 5, 2010.

because of the impending deadline to provide notice of the existence of any possible Claims, there is not sufficient time to await the confirmation and effectiveness of a plan of reorganization or liquidation (as the case may be) pursuant to which an appointed fiduciary would have standing to pursue the Claims.

8. In light of the aforementioned conflict, as well as the timing issues regarding the assertion of such Claims, WTC, as the representative of the largest group of unsecured creditors in the instant case, respectfully submits that it should be given immediate standing to investigate, assert and pursue the Claims on behalf of the Estate and its creditors.[2] Furthermore, in connection therewith, WTC seeks explicit authorization to hold, assert, and if necessary, waive the attorney-client privilege and the work product privilege (collectively, the "Privileges"), solely for the benefit of, and on behalf of, the Estate with regard to its investigation, assertion, and pursuit of the Claims.[3]

## RELIEF REQUESTED

### I. DERIVATIVE STANDING

9. Although the Bankruptcy Code does not expressly authorize an indenture trustee to prosecute claims on behalf of the estate, an implied right exists under sections 503(b)(3)(B) and 1109(b) of the Bankruptcy Code. Section 1109(b) of the Bankruptcy Code provides:

> **A party in interest, including** the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or **an indenture trustee** may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

---

[2] Upon the appointment of an estate fiduciary, such as a statutory trustee, official creditors' committee, or plan trustee, such estate fiduciary can by Court order succeed to WTC's standing to pursue the Claims.

[3] WTC respectfully submits that any grant of derivative standing would necessarily vest WTC with authority to hold, assert, and if necessary, waive the Privileges. However, out of an abundance of caution, WTC seeks entry of an order explicitly confirming the same.

10. As a party in interest under section 1109(b) of the Bankruptcy Code, WTC asserts that granting it derivative standing to investigate, assert and prosecute the Claims on behalf of the bankruptcy estate is not only authorized by the Bankruptcy Code, but, as discussed in further detail below, appropriate under the circumstances. See Jefferson County Bd. of Comm'rs v. Voinovich (In re The V Cos.), 292 B.R. 290, 295 (6th Cir. B.A.P. 2003) ("[C]onsistent with the broad right of participation conferred by section 1109(b), the court may authorize a party in interest to commence litigation on behalf of the estate if certain conditions are satisfied.") (quoting 7 Lawrence P. King, Collier on Bankruptcy ¶ 1109.05, 1109-46 to -47 (15th ed. rev. 1999)); Point Serv. Corp. v. Pritchard Mining Co., Inc., 2010 WL 1410673, at *4 (S.D.W. Va. Mar. 31, 2010) (citing section 1109(b) and In re STN Enters., 779 F.2d 901, 904 (2d Cir. 1985) for the proposition that party in interest may be granted derivative standing to initiate a lawsuit where the debtor-in-possession has abused its discretion or has unjustifiably failed to bring suit on its own behalf).

11. In addition, section 503(b)(3)(B) of the Bankruptcy Code allows for the priority payment of expenses of a "creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B); see Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 565-66 (3d Cir. 2003) (section 503(b)(3)(B) of the Bankruptcy Code evinces a Congressional intent for creditors to obtain derivative standing because "[a]ny other result would render that provision superfluous, for absent a judicial power to authorize derivative suits by creditors, it makes no sense to speak of rewarding a creditor who sues, with court permission, to recover property for the benefit of the estate.").

12. Courts have generally required a four-part showing prior to granting an individual creditor's derivative standing to pursue claims: (i) a demand has been made upon the statutorily authorized party to take action (unless demand is excused as explained below); (ii) the demand is declined; (iii) a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (iv) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case. See Canadian Pacific Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.), 66 F.3d 1436, 1446 (6th Cir. 1995); see also PW Enters., Inc. v. North Dakota Racing Comm'n (In re Racing Servs, Inc.), 540 F.3d 892, 900 (8th Cir. 2008) (applying similar four-part test to a creditor's motion for derivative standing); Fogel v. Zell, 221 F.3d 955, 965-66 (7th Cir. 2000) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee.").

### A. Demand on the Debtor and its Refusal

13. Under the circumstances of this case, a formal demand upon the Debtor to bring the Claims should not be required. The potential defendants against whom the Claims would be brought are insiders of the Debtor. Accordingly, the persons in control of the Debtor are conflicted either because they are potential targets of the Claims or because of their relationships with the potential targets. In light of these circumstances, it is not reasonable to expect the Debtor to investigate vigorously the Claims and assert the Claims that exist in time to trigger coverage under the D&O Policies. Therefore, the demand and refusal requirements should be deemed satisfied. See In re G-I Holdings, Inc., 313 B.R. 612, 630 (Bankr. D.N.J. 2004) (demand and refusal requirement deemed fulfilled when claims arose from transactions implemented by

the debtor's executives, thus evidencing that any formal demand to prosecute claims would have been refused); see also Official Comm. Of Unsecured Creditors of Nat. Forge Co. v. Clark (In re Nat. Forge Co.), 326 B.R. 532, 545 (W.D. Pa. 2005) (bankruptcy court was justified in concluding that the debtor would have declined to bring avoidance and breach of fiduciary duty claims when debtor's management also would have been named defendants, and "thus, would have been operating under a patent conflict of interest if faced with a demand to file suit"); SouthTrust Bank N.A. v. Jackson (In re Dur Jac Ltd.), 254 B.R. 279, 286 (Bankr. M.D. Ala. 2000) (no demand on debtor was necessary where action to be asserted by individual creditor was against debtor's own children, thus evidencing that any formal demand to prosecute claims would have been refused); Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (D. Del. 2004) (holding that bankruptcy court should have granted individual creditor derivative standing without citing any formal demand made on the debtor).

  **B.**  **Colorable claims**

14.  To determine whether the Claims are colorable, the Court must determine whether WTC has asserted claims that "would survive a motion to dismiss." In re Racing Servs., Inc., 540 F.3d at 900; see also G-I Holdings, Inc., 313 B.R. at 631 (quoting Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901, 905 (2d Cir. 1985)) (a colorable claim is a claim "for relief that on appropriate proof would support a recovery").

15.  There is no question that given appropriate proof of breaches by Insiders of their duties to the Debtor or their constituents, misrepresentations, failures to disclose and other wrongful acts, and negligence committed by the Insiders, the Claims would support a recovery for the Estate. The facts surrounding the seizure of the Bank by the regulatory authorities strongly suggest that the Debtor was mismanaged grievously, lacked effective internal controls

and engaged in flawed financial reporting. Accordingly, further investigation of the Claims by WTC likely will uncover strong evidentiary support for viable causes of action under bankruptcy and/or applicable non-bankruptcy law the pursuit of which likely will increase the property of the Estate available for distribution to creditors. Therefore, the Claims are colorable.

16. As explained in Part I of this Motion, because the Debtor is conflicted with respect to the Claims, demand is excused and refusal is imputed to the Debtor. See G-I Holdings, Inc., 313 B.R. at 643 (referring to the debtor's "imputed refusal to bring suit"). Once refusal is so established, the inquiry turns to whether it is unjustifiable. Id.

### C. Unjustifiable refusal

17. In determining whether a debtor unjustifiably refuses to pursue a claim, courts consider the following factors: 1) whether a conflict of interest exists between the debtor and the parties against whom the creditor's derivative action will be brought; 2) whether the creditor's interests are protected despite the debtor's refusal; 3) whether allowing the creditor to pursue the action on the debtor's behalf will benefit the estate; and 4) whether appointing a trustee and allowing the trustee, as opposed to the creditor, to pursue the action or converting the Chapter 11 case to a Chapter 7 case would be more beneficial to the estate. Id. "If a creditor pleads facts to support the conclusion that it has a colorable claim . . . and if the bankruptcy court finds that the claim will likely benefit the estate based on a cost-benefit analysis, then the creditor has raised a rebuttable presumption that the debtor-in-possession's failure to bring that claim is unjustified." In re Gibson Group, Inc., 66 F.3d at 1442 (creditor may also allege reasons why the debtor-in-possession failed to pursue a cause of action, such as the existence of a conflict of interest, in addition to pleading facts showing an unpursued colorable claim likely to benefit the estate); In

re Racing Servs., Inc., 540 F.3d at 900 ("[A] trustee almost certainly abuses his discretion by refusing to bring a creditor's claim that, if successful, would clearly benefit the estate.").

18. The Debtor' imputed refusal to bring the Claims is clearly unjustified. As noted above, a conflict of interest exists between the Debtor and the Insiders. Accordingly, the Debtor's present officers and directors cannot be expected to authorize the Debtor to bring Claims against themselves or other officers and directors with whom they have had relationships. See G-I Holdings, Inc., 313 B.R. at 643 (debtor's inaction and deemed refusal found unjustified where claim at issue involved avoidance action against debtor's subsidiary corporation because debtor was "operating under at least the influence of conflicts of interest."); Nat. Forge Co., 326 B.R. at 545 (deemed refusal found unjustified where debtor would have declined to bring avoidance and breach of fiduciary duty claims against debtor's management).

19. Furthermore, possible alternatives to investigation, assertion and pursuit of the Claims by WTC do not appear to be in the best interests of the Estate. First, WTC represents the interests of the beneficial holders of the Trust Preferred Securities, who are the largest group of unsecured creditors in the instant case. Because no creditors' committee has been appointed, there is no other party in interest that could reasonably be expected (if granted standing) to investigate, assert and pursue the Claims. Second, conversion to Chapter 7 at this time may defeat the Debtor' ability to maximize the value of its assets through a plan of reorganization. Moreover, the appointment of a Chapter 11 trustee at this time would not appear to facilitate the plan process such that a plan could be confirmed and effective (and the Claims investigated and asserted) before the D&O Policies' claims reporting deadlines expire. Accordingly, it is in the best interests of the Estate and its creditors for WTC to be authorized immediately to investigate,

assert and pursue the Claims, until the appointment of an estate fiduciary who is authorized by Court order to succeed to WTC's standing.

## II. AUTHORITY TO HOLD AND WAIVE PRIVILEGES

20. In connection with the requested grant of derivative standing (which as discussed above is warranted under the circumstances), WTC seeks to ensure that the Debtor and the Insiders cannot refuse to produce certain documents or other information relevant to WTC's investigation of the Claims, including any documents or other information that otherwise could be withheld based on a claim of a privilege held by the Debtor. Therefore, to the extent the grant of derivative standing does not provide WTC with the authority to hold, assert, and if necessary, waive the Privileges, WTC respectfully submits that it is entitled, pursuant to the Garner Doctrine (as defined below), to be vested explicitly with such authority.

21. The fiduciary exception set forth in Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970) (the "Garner Doctrine") overrides any privilege the Debtor otherwise might hold with respect to documents or other information sought by WTC in connection with the investigation of the Claims. The Garner Doctrine provides that, "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of these interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." Id. at 1103-04. Garner has not been limited to shareholder derivative suits and has become a general "fiduciary" exception to the attorney-client privilege. Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ., 1995 WL 491491, at *5 (S.D.N.Y. Aug. 17, 1995); see also In re Grand Jury Subpoena, 274 F.3d 563, 573 (1st Cir. 2001) (extending the reasoning of Garner to hold that a "corporation may unilaterally waive the attorney-client privilege with

respect to any communications made by a corporate officer in his corporate capacity" even if that officer has an individual attorney-client relationship with the corporation's counsel); In re Witness Before Special Grand Jury 2000-2, 288 F.3d 289, 294 (7th Cir. 2002) (citing Garner for the proposition that a corporate attorney has no right or obligation to keep otherwise confidential information from shareholders); Fausek v. White, 965 F.2d 126, 132-33 (6th Cir. 1992) (applying Garner Doctrine to conclude that good cause was established for not permitting corporation to rely on attorney-client privilege against former shareholders); In re Atlantic Fin. Mgmt. Sec. Litig., 121 F.R.D. 141, 146 (D. Mass. 1988) (recognizing the applicability of the Garner Doctrine where a fiduciary relationship exists between managers and shareholders, and in other situations in which there exists a fiduciary relationship).

22.     In Official Committee of Asbestos Claimants of G-I Holding, Inc., 342 B.R. 416 (S.D.N.Y. 2006), the court found the Garner Doctrine applicable to discovery sought by a creditors' committee under circumstances similar to the present case. There, the committee was vested by the Bankruptcy Court with standing to pursue and prosecute any and all claims and causes of action belonging to the debtor and/or its estate against the debtor's former chairman and CEO relating to certain stock transfer transactions. Id. at 418. In the action brought by the committee, the defendants (including the debtor) asserted a claim of attorney-client privilege with respect to a number of documents the committee had requested. Id. The committee argued, among other things, that the Garner Doctrine defeated the defendants' assertion of privilege with respect to documents and communications subject to the debtor's attorney-client privilege. Id. at 420. Applying the Garner Doctrine to the facts of the case, the G-I Holdings court held that "good cause" existed to set the attorney-client privilege aside because "of the obvious and irreconcilable conflict presented to G-I by the Committee's claims," and as a result, required the

debtor to produce the documents it withheld on the basis of the attorney-client privilege. Id. at 425.

24. In addressing the issue of "good cause" under Garner, the G-I Holdings court examined the following four factors: " '(1) the discovering party's stake in the fiduciary relationship; (2) the apparent merit of the claim; (3) the need of the discovering party for the information; and (4) the nature of the communication itself.' "[4] Id. at 424. For the following reasons, WTC submits that the Garner Doctrine is applicable in the present case.

### A. WTC's Stake in the Fiduciary Relationship

24. With respect to the first factor, a lesser degree of scrutiny is applied in determining whether good cause exists to override the privilege when "the party seeking discovery seeks to recover on behalf of the corporation, rather than on behalf of individual shareholders or claimants . . . ." Id. at 424-25. That situation exists in this case because WTC is attempting to discover more precise evidentiary support for pursuit of the Claims against the Insiders for the benefit of the Estate and its creditors. Accordingly, a relaxed standard is applied in determining whether good cause exists.

25. Given that WTC meets the above-described requirements for obtaining derivative standing, and should be vested with standing to investigate, assert, and prosecute the Claims against the Insiders on behalf of the Estate and its creditors, it is clear that WTC has a very important stake in the fiduciary relationship. Therefore, the first factor strongly supports vesting WTC with the authority to hold, assert or, if necessary, waive the Privileges, solely for the benefit of the Estates.

---

[4] Although Garner set forth a detailed list of considerations relevant to the good cause inquiry, the G-I Holdings court found that the four factors listed above aptly summarized the considerations delineated in Garner. See id.

### B. Merit of the Claims

26. The second factor likewise supports vesting WTC with the authority to hold, assert or, if necessary, waive the Privileges, solely for the benefit of the Estates. As explained above, WTC has shown that colorable claims may exist, and as a result, WTC should be given the authority to properly investigate the existence of such claims, which includes obtaining full access to documents and other information pertaining thereto. The Debtor's financial collapse and the seizure of the Bank by the regulatory authorities strongly suggest that the Debtor was mismanaged grievously, lacked effective internal controls and engaged in flawed financial reporting. Accordingly, investigation of the Claims by WTC, unfettered by claims of privilege, is calculated to uncover strong evidentiary support for viable causes of action under bankruptcy and/or applicable non-bankruptcy law, the pursuit of which well may increase the property of the Estate available for distribution to creditors. Therefore, the Claims have apparent merit.

### C. WTC's Need for the Information

27. Furthermore, as in G-I Holdings, the third factor supports vesting WTC with the authority to hold, assert or, if necessary, waive the Privileges, solely for the benefit of the Estates, inasmuch as WTC has a substantial need to discover without delay the information being withheld. See id. at 425. WTC's need for the information and documents requested is twofold. First, without access to the documents that the Insiders may withhold, in the absence of the relief requested, on grounds that they are subject to the Privileges, WTC's investigation will be impeded. The Debtor (or a statutory or plan trustee, see Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 358 (1985)), would not be impeded in this fashion, and there is no justification for treating WTC, who after entry of an order granting it derivative standing would qualify as an estate fiduciary with the sole responsibility for investigating and

asserting the Claims, any differently. Second, in light of the timing issues presented by the impending deadlines for reporting claims under the D&O Policies, prompt abrogation or waiver of the Privileges at the instance of WTC, solely for the benefit of the Estate, is a necessity.

### D. Nature of the Communication

28. The fourth factor noted by the G-I Holdings court encompasses the following considerations articulated by the court in Garner: "whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons." Garner, 430 F.2d at 1104. The fourth factor supports granting the relief requested in this Motion because the documents and other information WTC will seek to discover relate to past actions relevant to the Claims to be investigated, do not concern advice about the litigation itself, will be reasonably identified to enable the Insiders and others to respond adequately to the potential requests, and will not concern trade secrets or other information the Debtor has an interest in keeping confidential for independent reasons. Furthermore, disclosure of privileged information to WTC shall not constitute a waiver or abrogation of the applicable privilege with respect to any other party.

29. For the foregoing reasons, WTC respectfully requests that the Court grant it derivative standing to investigate, assert and pursue the Claims on behalf of the Estate and its creditors, and that any order granting such relief expressly provide that WTC is vested with the authority to hold, assert, and if necessary, waive the Privileges.

WHEREFORE, WTC respectfully requests that this Court (a) grant the Motion; (b) grant WTC standing to investigate, assert and pursue the Claims against the Insiders on behalf of the Estate, until such time as the Court appoints an estate fiduciary to succeed to WTC's standing; (c) vest WTC with the authority to hold, assert, and if necessary, waive the Privileges; and (d) grant such other and further relief as is appropriate under the circumstances.

**RESPECTFULLY SUBMITTED**, this 6th day of October, 2010

KILPATRICK STOCKTON LLP

/s/ Todd C. Meyers
Todd C. Meyers (admitted *pro hac vice*)
Mark A. Fink (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)
tmeyers@kilpatrickstockton.com
mfink@kilpatrickstockton.com

and

ELDIA M. DIAZ-OLMO LAW OFFICES

Eldia M. Diaz-Olmo
USDC No. 128003
Aon Center Building
304 Ponce de Leon Ave.
Suite 1100
Hato Rey, Puerto Rico 00907
(787) 641-7355 (Telephone)
(787) 641-7354 (Facsimile)
diazolmo@villamil.net

*Counsel for Wilmington Trust Company, as Indenture Trustee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2010 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will in turn send notification of such filing to all interested parties of record.

                                              /s/ Todd C. Meyers
                                              Todd C. Meyers