UNITED STATES BANKRUPTCY COURT
DISTRICT OF PUERTO RICO

R&G FINANCIAL CORPORATION

DEBTOR

CASE NO    10-04124-11 (ESL)

CHAPTER 11

**DISCLOSURE STATEMENT FOR THE DEBTOR'S FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION**

Robert W. Jones
Brent McIlwain
Patton Boggs LLP
2000 McKinney Avenue, Suite 1700
Dallas, Texas  75201
Telephone: (214) 758-1500
Facsimile:  (214) 758-1550
rwjones@pattonboggs.com
bmcilwain@pattonboggs.com

Jorge I. Peirats, Esq.
Pietrantoni Mendez & Alvarez, LLP
Popular Center, 19th Floor
209 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Telephone: (787) 274-1212
Facsimile:  (787) 274-1470
jpeirats@pmalaw.com

Counsel for the R&G Financial Corporation,
Debtor and Debtor-in-Possession

Dated: September 6, 2011

603415

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS. THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. R&G FINANCIAL CORPORATION, THE DEBTOR AND DEBTOR-IN-POSSESSION (THE "DEBTOR") BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, OR THE PLAN SUPPLEMENT SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

603415

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE DEBTOR CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

ALTHOUGH THE DEBTOR HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

PLEASE REFER TO ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

UNLESS OTHERWISE SPECIFICALLY INDICATED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED ON AN ANALYSIS OF DATA AND DOCUMENTS AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON NOVEMBER 29, 2011, AT 2:00 P.M. PREVAILING ATLANTIC TIME AT COURTROOM 2, UNITED STATES POST OFFICE & COURTHOUSE, 300 RECINTO SUR STREET, SAN JUAN, PUERTO RICO 00901. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING FILED BY THE DEBTOR.**

**TO BE COUNTED, THE BALLOTS UPON WHICH HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE SOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTOR.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE NOVEMBER 17, 2011, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

603415

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTOR'S EXPECTATIONS ABOUT FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, PARTICULARLY IN LIGHT OF THE CURRENT WORLDWIDE FINANCIAL AND CREDIT CRISIS, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM FILINGS OF THE DEBTOR OR THAT WAS OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING DISTRIBUTIONS UNDER THE PLAN. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE ARE THE FOLLOWING: (1) THE DEBTOR'S ABILITY TO DEVELOP, PROSECUTE, CONFIRM, AND CONSUMMATE A PLAN WITH RESPECT TO THIS CHAPTER 11 CASE; (2) THE OUTCOME AND TIMING OF EFFORTS TO LIQUIDATE CERTAIN ASSETS OF THE DEBTOR; AND (3) THE OUTCOME OF LITIGATION WITH THE FDIC, CERTAIN FORMER OFFICERS AND DIRECTORS OF THE DEBTOR AND VARIOUS OTHER PARTIES.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE DEBTOR IS UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIMS ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

603415

**TABLE OF CONTENTS**

I.      SUMMARY ......................................................................................................... 1

        A.      Overview of Chapter 11 ............................................................................. 1

        B.      The Purpose and Effect of the Plan ........................................................... 2

        C.      Treatment of Claims and Interests Under the Plan ..................................... 2

                1.      Summary of Classified Claims and Interests of RGFC ................... 3

                2.      Unclassified Claims ........................................................................ 4

                3.      Summary of Classification, Treatment and Projected Recoveries of
                        Classified Claims and Interests ...................................................... 4

        D.      Claims Estimates ...................................................................................... 6

        E.      Transactions Contemplated by the Plan ..................................................... 6

        F.      Consummation .......................................................................................... 7

        G.      Liquidation Analysis ................................................................................. 7

        H.      Risk Factors .............................................................................................. 8

        I.      Voting and Confirmation ........................................................................... 8

II.     BACKGROUND TO THE CHAPTER 11 CASE ............................................... 10

        A.      The Debtor's Business ............................................................................. 10

        B.      Debt Structure ........................................................................................ 12

                1.      FirstBank Secured Indebtedness ................................................... 12

                2.      Trust Preferred Subordinated Debentures ..................................... 13

        C.      Stock ....................................................................................................... 14

III.    THE CHAPTER 11 CASE ................................................................................. 14

        A.      General Case Administration Matters ....................................................... 14

        B.      FirstBank Settlement Agreement ............................................................. 16

        C.      Motion to Extend the Automatic Stay ..................................................... 18

        D.      Wilmington Trust Company's Derivative Standing Investigation ............... 19

        E.      Motion for Relief from Stay by the Debtor's Officers and Directors ......... 21

        F.      Litigation with the FDIC .......................................................................... 22

        G.      Exclusivity .............................................................................................. 22

IV.     SUMMARY OF THE PLAN .............................................................................. 23

        A.      Administrative and Priority Tax Claims .................................................... 23

                1.      Administrative Claims .................................................................. 23

                2.      Priority Tax Claims ...................................................................... 23

        B.      Classification and Treatment of Claims and Interests ............................... 24

                1.      Summary ...................................................................................... 24

|  | 2. | Summary of Classified Claims and Interests of RGFC | 24 |
|  | 3. | Classification and Treatment of Claims and Interests of RGFC | 24 |
| C. | | Means for Implementation of the Plan | 29 |
|  | 1. | Appointment of a Plan Administrator and a Plan Consultant | 29 |
|  | 2. | Fees and Expenses of Liquidating RGFC | 29 |
|  | 3. | Periodic Reports to Be Filed by Liquidating RGFC | 29 |
|  | 4. | Directors/Officers of the Debtor on the Effective Date | 29 |
|  | 5. | Plan Administrator | 30 |
|  | 6. | Wind Down and Dissolution of the Debtor | 31 |
|  | 7. | Cancellation of Existing Securities and Agreements; Claims of Subordination | 32 |
|  | 8. | Vesting of Assets in Liquidating RGFC | 35 |
|  | 9. | Deregistration | 35 |
|  | 10. | Merger/Dissolution/Consolidation | 35 |
| D. | | Provisions Governing Distribution | 36 |
|  | 1. | Initial Distribution Date | 36 |
|  | 2. | Disputed Claims Reserve | 36 |
|  | 3. | Quarterly Distributions | 37 |
|  | 4. | Record Date for Distributions | 37 |
|  | 5. | Delivery of Distributions | 37 |
|  | 6. | Surrender of Canceled Instruments and Securities | 39 |
|  | 7. | Manner of Cash Payments Under the Plan or the Plan Administrator Agreement | 40 |
|  | 8. | Time Bar to Cash Payments by Check | 40 |
|  | 9. | Compliance with Tax Requirements | 41 |
|  | 10. | No Payments of Fractional Dollars | 41 |
|  | 11. | Interest on Claims | 41 |
|  | 12. | No Distribution in Excess of Allowed Amount of Claim | 42 |
|  | 13. | Setoff and Recoupment | 42 |
|  | 14. | Contractual Subordination Rights | 42 |
| E. | | Disputed Claims | 43 |
|  | 1. | No Distribution Pending Allowance | 43 |
|  | 2. | Resolution of Disputed Claims | 43 |
|  | 3. | Objection Deadline | 43 |
|  | 4. | Estimation of Claims | 43 |
|  | 5. | Disallowance of Claims | 43 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 44 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 44 |
|  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 44 |
| G. | | Conditions Precedent to Confirmation and the Effective Date | 45 |
|  | 1. | Conditions to Confirmation | 45 |
|  | 2. | Conditions Precedent to the Effective Date | 45 |
|  | 3. | Waiver of Conditions Precedent | 45 |
| H. | | Release, Injunction, and Related Provisions | 46 |
|  | 1. | Compromise and Settlement | 46 |
|  | 2. | Exculpation | 46 |

603415

|  | 3. | No Release of Co-Obligor or Joint Tortfeasor | 47 |
|  | 4. | Preservation of Rights of Action | 47 |
|  | 5. | Release and Injunction | 49 |
|  | 6. | Injunction Against Interference with the Plan | 50 |
|  | 7. | Reservation of Litigation Rights | 50 |
|  | 8. | Releases of Liens | 51 |

| I. | No Discharge for the Debtor | 51 |

| J. | United States Securities and Exchange Commission | 51 |

| K. | Retention of Jurisdiction | 51 |

| L. | Miscellaneous Provisions | 53 |
|  | 1. | Final Fee Applications and Initial Trustee Fees | 53 |
|  | 2. | Payment of Statutory Fees | 54 |
|  | 3. | Modification of Plan | 54 |
|  | 4. | Revocation of Plan | 54 |
|  | 5. | Successors and Assigns | 55 |
|  | 6. | Governing Law | 55 |
|  | 7. | Reservation of Rights | 55 |
|  | 8. | Section 1146 Exemption | 55 |
|  | 9. | Directors and Officers Liability Insurance | 56 |
|  | 10. | Further Assurances | 56 |
|  | 11. | Service of Documents | 56 |
|  | 12. | Filing of Additional Documents | 58 |
|  | 13. | Aid and Recognition | 58 |
|  | 14. | Document Retention | 58 |

| V. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | 58 |

| A. | The Confirmation Hearing | 58 |

| B. | Confirmation Standards | 59 |

| C. | Financial Feasibility | 61 |

| D. | Best Interest of Creditors Test | 61 |

| E. | Acceptance by Impaired Classes | 63 |

| F. | Confirmation Without Acceptance by All Impaired Classes | 64 |
|  | 1. | No Unfair Discrimination | 64 |
|  | 2. | Fair and Equitable Test | 64 |

| VI. | CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING | 66 |

| A. | Certain Bankruptcy Law Considerations | 66 |
|  | 1. | Parties in Interest May Object to the Plan's Classification of Claims and Interests | 66 |
|  | 2. | Failure to Satisfy Vote Requirements | 66 |
|  | 3. | The Debtor May Not Be Able to Secure Confirmation of the Plan | 67 |
|  | 4. | Nonconsensual Confirmation | 68 |
|  | 5. | The Debtor May Object to the Amount or Classification of a Claim | 68 |
|  | 6. | The FDIC Has Asserted a Claim under section 365(o) of the Bankruptcy Code | 68 |
|  | 7. | Risk of Non-Occurrence of the Effective Date | 69 |

8.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan** ........................................................................................ 69

**B.**     **Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims** ........................................................................................ 69

1.     **The Debtor Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes** ........................................................................................ 70

2.     **The Debtor is Involved in Litigation Which, if Adversely Determined, Could Result in Substantially Less Funds Being Available for Distribution** ........................................................................................ 70

**C.**     **Disclosure Statement Disclaimer** ........................................................................................ 70

1.     **Information Contained Herein Is for Soliciting Votes** ...................................... 70

2.     **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission** ........................................................................................ 70

3.     **No Legal Advice is being provided in this Disclosure Statement** .................. 71

4.     **No Admissions Made** ........................................................................................ 71

5.     **Failure to Identify Litigation Claims or Projected Objections** .................... 71

6.     **No Waiver of Right to Object or Right to Recover Transfers and Assets** ........................................................................................ 71

7.     **Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update** ........................................................................................ 71

8.     **No Representations Outside this Disclosure Statement Are Authorized** ........................................................................................ 72

**D.**     **Liquidation Under Chapter 7** ........................................................................................ 72

**VII.**     **CERTAIN TAX CONSEQUENCES** ........................................................................................ 72

**VIII.**     **PLAN SUPPLEMENT** ........................................................................................ 73

**IX.**     **CONCLUSION AND RECOMMENDATION** ........................................................................................ 74

<u>EXHIBITS</u>

Exhibit A — Plan

Exhibit B — Liquidation Analysis

603415

# I.    SUMMARY

The following summary of this Disclosure Statement is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.[1]

On May 14, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Puerto Rico (the "Bankruptcy Court"). Judge Enrique S. Lamoutte is presiding over the Debtor's Chapter 11 Case. The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

R&G Financial Corporation ("RGFC") was the direct parent of R-G Premier Bank of Puerto Rico (the "Bank"), a state-chartered nonmember bank, through which RGFC primarily conducted its business.

This Disclosure Statement is filed by the Debtor pursuant to section 1125 of the Bankruptcy Code and is being submitted to holders of Claims against and Interests in the Debtor in connection with the solicitation of votes to accept or reject the Plan and the hearing to consider confirmation of the Plan, which is scheduled for November 29, 2011, at 2:00 p.m. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code. The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession. **As a result of various factors described more fully herein, the Debtor believes that the**

---

[1] Capitalized terms used and not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

**Plan is in the best interests of its creditors.** To fairly and expeditiously distribute the Debtor's assets consistent with the Bankruptcy Code, the Debtor has proposed the Plan. Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### B.     The Purpose and Effect of the Plan

The Plan provides for the monetization and distribution of the assets of the Debtor for the benefit of Holders of Allowed Claims. These assets will be distributed to Holders of Allowed Claims on or after the Effective Date of the Plan. In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtor's Estate (including Causes of Action not expressly released under the Plan) shall vest in Liquidating RGFC. Liquidating RGFC shall continue in operation in order to monetize the remaining assets, continue litigation with the FDIC and potentially pursue litigation against other parties, and make distributions under the Plan. The Plan Administrator shall be appointed on the Effective Date of the Plan and shall be responsible for implementing the Plan, subject to the oversight of the Plan Consultant.

The Debtor believes that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Debtor believes that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or attempts by other parties in interest to file competing plans, would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

### C.     Treatment of Claims and Interests Under the Plan

The Plan divides all Claims, other than Administrative Claims and Priority Tax Claims, and all Interests into various Classes. Listed below is a summary of the Classes of Claims and Interests under the Plan, including status and voting rights pursuant thereto.

603415

### 1. Summary of Classified Claims and Interests of RGFC

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Notes Claims | Impaired | Yes |
| 6 | RGFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 7 | RGFC Common Stock Interests | Impaired | No (deemed to reject) |

The following table summarizes the Classes of Claims and Interests under the Plan, as well as the treatment of such Classes and projected recoveries. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern. The projected recoveries are based upon certain assumptions contained in the Liquidation Analysis prepared by the Debtor, its Professionals, and its representatives. The ranges of recoveries listed below are based on various assumptions, including assumptions regarding asset realization, the total amount of the Allowed General Unsecured Claims, Subordinated Notes Claims, FDIC Claims, Administrative Claims, Non-FDIC Priority Claims and Priority Tax Claims, and assumptions concerning the costs to monetize the Debtor's assets and pursue certain litigation. In addition, absent a successful resolution of the FDIC Claims that allegedly are entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, no Distributions will be made to Holders of Allowed Claims in any RGFC Classes, other than Class 1 and Class 2. The timing of any resolution of any FDIC Claims that are allegedly entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, and any resulting Distribution thereon, cannot be estimated or predicted with any certainty. The classification, treatment and the projected recoveries of classified Claims and Interests under the Plan are described in summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article III of the Plan.

## 2. Unclassified Claims

| Claim | Plan Treatment | Range of Estimated Claims | Project Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Paid in full in Cash | $0.2 - 0.4 million | 100% |
| Priority Tax Claims | Paid in full in Cash | $0[2] | 100% |

## 3. Summary of Classification, Treatment and Projected Recoveries of Classified Claims and Interests

| RGFC CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
| 1 | Secured Claims | (1) Paid in full in Cash, (2) receive collateral securing its Allowed Secured Claim, plus post-petition interest if required by section 506(c) of the Bankruptcy Code, or (3) receive other treatment rendering Secured Claim Unimpaired | $0 | 100% |
| 2 | Non-FDIC Priority Claims | Each Holder shall receive Cash equal to full amount of its Allowed Claim, unless Holder agrees to less favorable treatment | $0.350 to $0.900 million | 100% |
| 3 | FDIC Claims | Each Holder of an Allowed FDIC Claim shall: (i) to the extent that any portion of the Allowed FDIC Claim is entitled to priority under sections 507(a)(9) or 365(o) of the | $Unliquidated[3] | N/A |

---

[2] The Puerto Rico Department of Treasury (the "PRT") filed a Proof of Claim alleging that it held Priority Tax Claims in excess of $3.85 million. However, the PRT's Proof of Claim, including its alleged Priority Tax Claims, was denied in its entirety by an order dated June 3, 2011. Consequently, the PRT's alleged $3.85 million Priority Tax Claim was not included in the analysis in the chart above.

[3] The FDIC filed a Proof of Claim in the Chapter 11 Case, which alleged that the FDIC held FDIC Claims entitled to priority under sections 507(a)(9) and/or 365(o) of the Bankruptcy Code "in an amount to be determined." The FDIC's Proof of Claim did not include any evidence or documentation to substantiate the existence of its alleged priority claim, nor has the FDIC responded to the Debtor's requests to review such information and documentation underpinning the FDIC's alleged priority claim. The Debtor believes that ultimately, no FDIC Claims alleging priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code will be Allowed.

4

| | | RGFC CLAIMS AND INTERESTS | | |
|---|---|---|---|---|
| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
| | | Bankruptcy Code, the Holder of such an Allowed FDIC Claim entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code shall receive a Distribution of all Net Free Cash as such Net Free Cash is available on such distribution date until the portion of the Allowed FDIC Claim that is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code is paid in full; and (ii) with respect to any portion of the Allowed FDIC Claim that is not entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such FDIC Claim shall receive a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date. | | |
| 4 | General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | $10.9 to $15.4 million | 0.30%-2.3% |
| 5 | Subordinated Notes Claims | Each Allowed Subordinated Notes Claim shall receive a Pro Rata Distribution of Residual Net Free Cash. | Approx. $385 million | 0.30%-2.3% |
| 6 | RGFC Preferred Stock Interests | Stock Interests in RGFC Class 6 will be cancelled and shall not receive any distribution under the Plan. | N/A | 0% |
| 7 | RGFC Common Stock Interests | Stock Interests in RGFC Class 7 will be cancelled and shall not receive any distribution under the Plan. | N/A | 0% |

### D. Claims Estimates

Debtor RGFC's primary obligations are principal and interest payments on its Subordinated Notes Claims owed to the Holders of Trust Preferred Subordinated Debentures. As of the Petition Date, RGFC's obligations with respect to Subordinated Notes Claims totaled approximately $385.0 million. These debt obligations are all unsecured obligations of RGFC and are discussed in more detail later in this Disclosure Statement.

In addition, the FDIC has filed a Proof of Claim in the Debtor's Chapter 11 Case in an unliquidated amount, but in excess of $3.4 million. The FDIC's Proof of Claim asserts that it holds an unliquidated claim based on an alleged capital maintenance commitment made to a Federal depository institutions regulatory agency, but does not include documentation or evidence to substantiate the existence of its alleged capital maintenance claim. As discussed later in this Disclosure Statement, the Debtor vigorously disputes the validity and classification of the same.

The Puerto Rico Department of Treasury (the "PRT") filed a Proof of Claim in the Debtor's Chapter 11 Case that asserts a total claim in excess of $5.9 million, approximately $3.85 million of which was asserted as a Priority Tax Claim under Bankruptcy Code section 507(a)(8). Notably, the PRT's Proof of Claim did not allege that the Debtor has any liability for any unpaid, original tax obligations. Rather, the PRT's Proof of Claim is based entirely on interest, surcharges, and penalties relating to the Debtor's alleged failure to remit certain payment reconciliations along with its tax payments for certain tax years between 1997 and 2010. The PRT's Proof of Claim was denied in its entirety by a Bankruptcy Court order dated June 3, 2011.

Various other Claims have been filed in the Debtor's Chapter 11 Case; however, the Claims discussed above constitute the most significant in amount of Claims.

### E. Transactions Contemplated by the Plan

On the Effective Date, all of the Debtor's assets shall be transferred to, and vest in, Liquidating RGFC. The Plan provides for the appointment of Clifford Zucker, CPA as the Plan Administrator and Wilmington Trust Company as the Plan Consultant to oversee the activities of Liquidating RGFC.

The Plan Administrator, supervised by the Plan Consultant, shall be responsible for administering Liquidating RGFC as set forth under the Plan and the Plan Administrator Agreement, including monetizing all of Liquidating RGFC's assets, resolving all Claims, pursuing all Causes of Action and distributing Net Free Cash and Residual Net Free Cash.

**F.    Consummation**

Following confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to the occurrence of the Effective Date have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

**G.    Liquidation Analysis**

The Debtor believes that the Plan will produce a recovery for Holders of Allowed Claims against the Estate that is no less than what would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code. In fact, the Debtor believes recoveries under the Plan for Holders of Allowed Claims will likely be more than in a chapter 7 liquidation because of, among other things, (1) the additional Administrative Claims generated by conversion to a chapter 7 case and (2) the administrative costs of liquidation and associated delays in connection with chapter 7 liquidation.

The Debtor, together with its Professionals and Representatives, has prepared a Liquidation Analysis, a copy of which is attached to this Disclosure Statement as Exhibit B, to assist Holders of Claims in determining whether to vote to accept or reject the Plan. The Liquidation Analysis compares the proceeds to be realized if the Debtor were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the Distributions to Holders of Allowed Claims and Interests under the Plan. The analysis is based upon the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to the possibility of material change, including changes with respect to economic and business conditions and legal rulings. **Therefore, the**

**actual liquidation value of the Debtor could vary materially from the estimates provided in the Liquidation Analysis.**

### H.    Risk Factors

Prior to voting to accept or reject the Plan, each Holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article VI.

### I.    Voting and Confirmation

Holders of Claims in Classes 1 and 2 for RGFC are Unimpaired and are conclusively presumed to accept the Plan and therefore the vote of such Holders of Claims shall not be solicited. Holders of Interests in Classes 6 and 7 for RGFC are wholly Impaired and are also conclusively presumed to reject the Plan. Accordingly, Holders of Interests in Classes 6 and 7 for RGFC are not entitled to vote on the Plan, and the vote of such Holders of Interests shall not be solicited. Only Holders of Claims in Classes 3, 4, and 5 for RGFC are entitled to vote to either accept or reject the Plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan. The Debtor will tabulate all votes on the Plan for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

Assuming the requisite acceptances are obtained, the Debtor intends to seek confirmation of the Plan at the confirmation hearing scheduled to commence on November 29, 2011, at 2:00 p.m., prevailing Atlantic time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor also reserves the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established September 26, 2011, as the voting record date for determining which Holders of Claims are eligible to vote to accept or reject the Plan. Ballots, along with this Disclosure Statement, the Plan, and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the voting record date that are entitled to vote to accept or reject the Plan.

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE BALLOTS INDICATE THAT THE BALLOT MUST BE RETURNED TO THE VOTING AGENT. THE ADDRESS FOR BALLOTS RETURNABLE TO THE VOTING AGENT IS: KURTZMAN CARSON CONSULTANTS LLC, 599 LEXINGTON AVENUE, 39TH FLOOR, NEW YORK, NY 10022, ATTN: R&G FINANCIAL BALLOT TABULATION. FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE VOTING AGENT AT 888-249-2741. TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE SOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTOR.**

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other solicitation package materials, please request a copy from Kurtzman Carson Consultants LLC by calling (888) 249-2741, or by writing to Kurtzman Carson Consultants LLC, 599 Lexington Ave, 39th Floor, New York, NY 10022, Attn: R&G Financial Corporation. Copies of the Plan and Disclosure Statement are also available by visiting www.pattonboggs.com/newsletters/rgfc.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF GENERAL
UNSECURED CREDITORS AND RECOMMENDS THAT SUCH CREDITORS VOTE TO <u>ACCEPT</u>
THE PLAN.

## II.     BACKGROUND TO THE CHAPTER 11 CASE

The following is a general summary of the Debtor's businesses prior to the filing of its Chapter
11 Case.

### A.     The Debtor's Business

The Debtor was a financial holding company organized as a Puerto Rico Corporation.  Prior to
the Bank's closure, the Debtor conducted its principal operations through the Bank.  The Bank was
wholly-owned by, and was the primary asset of, RGFC. As a state-chartered nonmember bank, the Bank
was subject to regulation and examination by the Federal Deposit Insurance Corporation (the "<u>FDIC</u>"), its
primary federal regulator, and was also subject to regulation by the Office of the Commissioner of
Financial Institutions of the Commonwealth of Puerto Rico (the "<u>OCFI</u>").  As a bank holding company,
RGFC was also subject to regulation and examination by the Board of Governors of the Federal Reserve
(the "<u>FED</u>").  The Bank was one of ten banks operating in Puerto Rico before it was closed by the OCFI
on April 30, 2010.

Prior to its bankruptcy filing, the Debtor conducted operations for more than thirty years, and
provided a wide range of banking services through its subsidiaries.  These subsidiaries included the Bank,
which held many branches throughout Puerto Rico, as well as the Debtor's former banking subsidiary,
Crown Bank, which held numerous branches in the state of Florida.  The Debtor's interest in Crown Bank
was sold to a subsidiary of Fifth Third Bancorp in November 2007.  Banking services offered through
these subsidiaries included commercial banking services, corporate real estate and business lending,
residential construction lending, consumer lending, and credit cards.

In addition to these banking services the Debtor, at other times before its bankruptcy filing,
provided other financially-related services through various other subsidiaries, including investment
services, private banking, and real estate secured lending activities, including the origination, servicing,

purchase and sale of mortgages on single-family residences, the securitization and sale of various mortgage-backed and related securities, the holding and financing of mortgage loans and mortgage-backed and related securities for sale or investment, and the purchase and sale of servicing rights associated with such mortgage loans.

The lending activities of the Debtor's subsidiaries focused primarily on lending to residential properties, but were not limited solely to such loans. In addition to residential real estate loans, the loan portfolios of the Debtor and its subsidiaries included a diverse mix of other types of loans, including commercial real estate loans (CRE), acquisition development and construction loans (ADC), and commercial and industrial loans.

The effects of the global economic slowdown and "great recession" had a significant impact on the Debtor's financial condition and resulted in a significant reduction in the value of these loan portfolios. The resulting erosion of the value of the Bank's loan portfolio and capital position ultimately led to intervention by applicable banking regulators. On March 14, 2006, the Bank and the Debtor consented to the issuance of Cease and Desist orders by, respectively, the FDIC (the "2006 FDIC C&D Order") and the FED (the "2006 FED C&D Order," and collectively, with the 2006 FDIC C&D Order, the "2006 C&D Orders"). On that same date, the OCFI and the Bank also agreed that the issuance of the FDIC's March 14, 2006 C&D Order would be binding upon the OCFI and the Bank with the same legal effect as if the OCFI had issued a separate order.

The 2006 C&D Orders required the Debtor and the Bank to, among other things, file with the Fed and the FDIC within proscribed time periods updated plans to address the Bank's capital and liquidity, to engage a public consultant to report on specified matters relating to the mortgage loans in the loan portfolio, and to act on recommendations resulting therefrom. The Debtor and the Bank worked diligently to comply with the provisions of the 2006 C&D Orders and take appropriate measures to enhance the Bank's capital and liquidity positions. However, in the wake of the economic difficulties associated with the global economic slowdown that began shortly after entry of the 2006 C&D Orders, enhancing the Bank's capital position proved to be a challenging task.

On October 23, 2009, the board of directors of the Bank entered into a stipulation and consent to the issuance of an Amended Order to Cease and Desist with the FDIC (the "2009 FDIC C&D Order"), which amended and restated the 2006 FDIC C&D Order. Again, the OCFI and the Bank also agreed that the 2009 FDIC C&D Order would be binding upon the OCFI and the Bank as if the OCFI had issued a separate order. Pursuant to the terms of the 2009 C&D Order, the Bank was required to, among other things: (i) take affirmative actions that included engaging an independent consultant to analyze the Bank's management performance and staffing needs; (ii) submit various plans to address issues addressed in the 2009 FDIC C&D Order; (iii) maintain certain Tier 1 leverage ratios and risk based capital ratios, and (iv) review and adjust, as necessary, the Bank's allowances for loan losses and current level of past due and nonperforming loans.

Again, prior to, and following the entry of the 2009 FDIC C&D Order, the Debtor and the Bank worked to address all issues raised in the 2009 FDIC C&D Order and take steps to improve the Bank's profitability, capital levels, and liquidity. However, notwithstanding these efforts, the financial positions of the Debtor and the Bank continued to deteriorate. Consequently, on April 30, 2010, the OCFI closed the Bank and appointed the FDIC as receiver for the Bank. On that same day, the FDIC also entered into a Purchase and Assumption Agreement with Scotiabank de Puerto Rico ("Scotiabank"), whereby Scotiabank purchased substantially all of the Bank's assets and assumed certain of the Bank's liabilities, including liabilities for the Bank's deposits.

In the wake of the loss of its principal operating subsidiary, the Debtor filed a voluntary chapter 11 petition on May 14, 2010.

### B. Debt Structure

#### 1. FirstBank Secured Indebtedness

In February of 2004, R&G International Corporation, which as of the Petition Date was a division of RGFC, entered into a credit agreement with FirstBank International Branch, a division of FirstBank Puerto Rico ("FirstBank"). The terms of RGFC's Credit Agreement with FirstBank were amended and restated in February, 2008 and memorialized in an Amended and Restated Credit Agreement (the

12

"FirstBank Credit Agreement"). Pursuant to the FirstBank Credit Agreement, FirstBank Agreed to extend credit to RGFC, which would be secured by RGFC's interest in certain commercial real estate loan participations. As of the Petition Date, RGFC's outstanding obligations to FirstBank under the FirstBank Credit Agreement totaled approximately $32.5 million. FirstBank's pre-petition claims against the Debtor were satisfied pursuant to the FirstBank Settlement. As described in greater detail in Article III herein, pursuant to the FirstBank Settlement, FirstBank has waived all of its pre-petition claims against RGFC, and will not be entitled to receive any further distributions from RGFC under its Plan. Because FirstBank has withdrawn and waived its pre-petition claims in accordance with the FirstBank Settlement, and no longer holds a valid pre-petition claim against RGFC, FirstBank's pre-petition claim is not classified or treated under the Debtor's Plan.

### 2. Trust Preferred Subordinated Debentures

RGFC owns all of the common stock of various trusts. Trust Preferred Securities, issued by these trusts, are held by investors. Each of the trusts was formed for the purpose of issuing trust preferred securities and investing the proceeds from the sale thereof solely in junior subordinated debentures issued by RGFC, which in turn used the proceeds of the debentures for investment in the Bank or other corporate purposes. From 2003 through 2004, RGFC issued trust preferred securities through its trust subsidiaries. At the time of its bankruptcy filing, RGFC had obligations of approximately $385 million pertaining to outstanding subordinated debentures related to three trusts (the "Trust Preferred Subordinated Debentures"). These Trust Preferred Subordinated Debentures, by their terms, were junior in payment to RGFC's obligations to FirstBank under the FirstBank Credit Agreement. However, pursuant to the FirstBank Settlement, FirstBank waived any subordination rights provided in the Trust Preferred Subordinated Debentures. Following the execution of the FirstBank Settlement, the Debtor is not aware of any other outstanding indebtedness which would be senior to the Trust Preferred Subordinated Debentures. The Debtor believes that the all of its Trust Preferred Subordinated Debenture obligations are pari passu in payment with all other RGFC General Unsecured Claims. Wilmington Trust is the Indenture Trustee for the three outstanding Trust Preferred Subordinated Debentures.

### C. Stock

RGFC has four outstanding classes of preferred stock outstanding. On the Petition Date, RGFC had the following amounts of preferred stock authorized, issued, and outstanding: (i) 2,000,000 shares of RGFC Series A 7.40% Preferred Stock Interests; (ii) 1,000,000 shares of RGFC Series B 7.75% Preferred Stock Interests; (iii) 2,760,000 shares of RGFC Series C 7.60% Preferred Stock Interests; and (iv) 2,760,000 shares of RGFC Series D 7.25% Preferred Stock Interests. All RGFC preferred shares represent non-cumulative, perpetual shares of preferred stock, with a $25 liquidation value.

RGFC also has two outstanding classes of common stock outstanding. RGFC had 80,000,000 authorized shares of RGFC Class A Common Stock Interests, of which 21,559,584 shares were issued and outstanding on the Petition Date. These RGFC Class A Common Stock Interests have a par value of 0.01 per share and have been owned by Victor J. Galán, one of the Debtor's directors, since RGFC's founding. Additionally, RGFC also had 120,000,000 authorized shares of RGFC Class B Common Stock Interests, of which 29,625,180 shares were issued and outstanding on the Petition Date. These RGFC Class B Common Stock Interests have a par value of $0.01 per share.

Prior to the Petition Date, RGFC's Class B Common Stock was publicly traded on the New York Stock Exchange under the symbol "RGF". RGFC was delisted from the New York Stock Exchange in 2007.

## III.  THE CHAPTER 11 CASE

The following is a general summary of some of the key matters and occurrences in connection with the Debtor's Chapter 11 Case.

### A.  General Case Administration Matters

As previously noted, the Debtor filed its Chapter 11 petition on May 14, 2010. Prior to the Petition Date, all of the Debtor's officers and employees either resigned or were terminated from the Debtor's employ. In the wake of these resignations and terminations, Juan Agosto Alicea, chairman of the Debtor's Board of Directors, was appointed as the Debtor's sole officer. In order to continue the Debtor's operations and preserve its remaining assets, the Debtor retained the services of three contract

managers, Rolando Rodriguez Mancebo, Maria Cristina Mena, and José Luis Ortiz (collectively, the "Contract Managers"). In an order dated July 14, 2010, the Contract Managers were formally approved as the Debtor's representatives pursuant to Local Bankruptcy Rule 4002-1, and authorized to take any and all actions, on behalf of the Debtor, that the Debtor was required to perform during its bankruptcy case. Since their appointment as representatives, the Contract Managers have continued to assist the Debtor in facilitating an orderly wind-down of the Debtor's operations.

To assist the Debtor in carrying out its duties as a debtor-in-possession and to otherwise represent the Debtor's interests in the Chapter 11 Case, the Bankruptcy Court approved the employment of Patton Boggs LLP ("Patton Boggs") and Pietrantoni Mendez & Alvarez LLP ("PMA") as the Debtor's general bankruptcy counsel. The Bankruptcy Court also approved the Debtor's retention of Carlos M. Machado, P.A., of Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP ("Machado") as special counsel to the Debtor, to assist the Debtor in evaluating and protecting its interests in certain commercial real estate loan participations, which were secured by commercial real estate located in the State of Florida. Finally, Zaragoza & Alvarado LLP ("Zaragoza") was retained to provide the Debtor with certain accounting and taxation services.

The Debtor filed its schedules, statement of financial affairs, and list of equity security holders with the Bankruptcy Court on June 21, 2010. The Debtor's Schedules were subsequently amended on September 10, 2010 and February 14, 2011. The first meeting of creditors of the Debtor pursuant to section 341 of the Bankruptcy Code was held on July 7, 2010.

A Bar Date for all non-governmental claimants for which the deadline to file a proof of claim or interest was not extended by operation of the Bankruptcy Rules, was September 21, 2010. The Bar Date for all governmental claimants was November 17, 2010.

Debtor RGFC's primary assets now consist of approximately $2.2 million in cash, as well as potential litigation claims and investments in non-debtor subsidiaries, including RGFC's 100% ownership interest in non-debtor R&G Acquisition Holdings Corp. ("RAC"). RAC's principal asset is approximately $4.6 million of cash. RAC is currently participating in a pending administrative appeal

603415

before the Internal Revenue Service (the "IRS") regarding its tax liability for the tax years 2006 and 2007, in which the IRS is seeking taxes, interest, and penalties of no less than $4.9 million. The Debtor believes that the IRS' alleged claims against RAC for taxes, interest, and penalties are unfounded. However, until RAC's pending administrative proceeding is finally and conclusively resolved, it is uncertain what value (if any) may ultimately be realized from its interest in RAC.

The Debtor's assets also include certain directors and officers liability insurance policies which provide up to $35 million in coverage for acts occurring prior to December 30, 2010 (collectively, the "D&O Policies").

### B. FirstBank Settlement Agreement

Since the inception of its bankruptcy case, the Debtor has engaged in negotiations with its only pre-petition secured lender, FirstBank, regarding the potential satisfaction of FirstBank's pre-petition claim. On the Petition Date, FirstBank held a pre-petition claim in excess of $32 million, which related to the FirstBank Credit Agreement. The Debtor's obligations under the FirstBank Credit Agreement were secured by participations in loans secured by commercial real property in the State of Florida (the "Loan Participations"). As a result of the global economic slowdown of 2008 and concurrent weakness in the Florida real estate markets, the value of the Loan Participations on the Petition Date was significantly less than the amount of FirstBank's pre-petition claim.

Because FirstBank's collateral did not exceed the value of its pre-petition claim, FirstBank would have held a substantial unsecured claim against the Debtor's estate for the remaining loan balance above and beyond FirstBank's collateral value. The Debtor believed that this deficiency claim would have been large enough to provide FirstBank with a distribution of more than $3.0 million under its chapter 11 plan with respect to its unsecured "deficiency claim."

Ultimately, the Debtor and FirstBank were able to negotiate a global resolution of all of FirstBank's secured and unsecured claims against the Debtor. This agreement was memorialized in the FirstBank Settlement. Under the FirstBank Settlement, FirstBank agreed to accept the following

603415

consideration in full satisfaction of all of its pre-petition claims against the Debtor, whether secured, unsecured, or otherwise:

<ol type="a" style="list-style-type: lower-alpha;">
<li>FirstBank would receive a direct assignment of all outstanding Loan Participations securing the Debtor's obligations to FirstBank under the Credit Agreement;</li>

<li>The Debtor would consent to the Bankruptcy Court's distribution to FirstBank of cash proceeds from the Loan Participations on deposit into the Court's registry;</li>

<li>FirstBank would receive a one time cash payment of three million dollars ($3,000,000);</li>

<li>FirstBank would release its interest in any Loan Participation proceeds that were subject to alleged offset claims by Fifth Third Bank, administrative agent for the Loan Participations, which remained in Fifth Third's possession pending resolution of such alleged offset claims;</li>

<li>FirstBank would waive its right to receive distributions from the Debtor's estate before payment was made on any of the Debtor's Trust Preferred Subordinated Debentures, which were structurally subordinate to FirstBank before execution of the FirstBank Settlement; and</li>

<li>FirstBank would release the Debtor from any and all claims that FirstBank may have against the Debtor accruing before the execution of the FirstBank Settlement.</li>
</ol>

The Debtor believed that the FirstBank Settlement was in the best interest of its estate, as the FirstBank Settlement would permit satisfaction of FirstBank's unsecured claim with distributions in an amount less than the distributions that FirstBank was expected to receive under the Debtor's Plan, which would increase the potential pool of assets available for distribution to the Debtor's other creditors. Indeed, no party submitted any objection to the Debtor's proposed settlement with FirstBank after it was proposed in a motion filed on April 1, 2011.

The FirstBank Settlement was approved by an order of the Bankruptcy Court dated April 26, 2011. Since its approval on April 26, 2011, the Debtor and FirstBank have fully executed the provisions of the FirstBank Settlement, and all of FirstBank's pre-petition claims have been satisfied in full. Because FirstBank's pre-petition claims were fully satisfied through the FirstBank Settlement, FirstBank is not entitled to receive any distributions under the Plan and FirstBank's Claim has not been placed in any Plan Class.

## C.    Motion to Extend the Automatic Stay

Prior to August 2007, the Debtor was the sole shareholder of R&G Investments Corporation ("RGIC").  In August 2007, RGIC was formally dissolved, distributed substantially all of its assets to the Debtor and obtained formal certification from the Puerto Rico Department of State documenting its dissolution.  In connection with the agreement to dissolve RGIC, the Debtor agreed to assume all contingent litigation liabilities associated with claims by RGIC's former customers.

Notwithstanding RGIC's dissolution in 2007, three of RGIC's former customers instituted arbitration proceedings against RGIC and the Debtor relating to their prior dealings with RGIC.  Counsel for the Debtor filed an informative motion in the arbitration proceeding, which indicated that RGIC was a former subsidiary of the Debtor that had ceased operations and requested that the arbitrator stay the arbitration as to the Debtor and RGIC.

The arbitrator initially informed the Debtor that the arbitration would be stayed as to the Debtor and RGIC, but later indicated that the arbitration would be stayed with respect to the Debtor, but not RGIC.  Because any action nominally against RGIC would effectively constitute an action against the Debtor, in potential violation of the automatic stay, the Debtor filed a motion in the Bankruptcy Court requesting a determination as to whether permitting the arbitration matters to proceed against RGIC would constitute a violation of the automatic stay.  The Bankruptcy Court entered an interim order on June 11, 2010, which temporarily stayed the arbitration against RGIC, pending the results of subsequent briefing by the parties.  Following briefing by both the Debtor and the arbitration claimants, the Bankruptcy Court issued a final order on November 18, 2010, which held that the automatic stay did prohibit the continuation of an arbitration proceeding against RGIC, and extended the provisions of the automatic stay to the arbitration action.  The RGIC arbitration proceeding remains stayed pursuant to the Court's final order.

603415

### D. Wilmington Trust Company's Derivative Standing Investigation

Due to the closure of the Bank and the Debtor's bankruptcy filing, the Debtor's largest unsecured creditor, Wilmington Trust (in its capacity as trustee for the Trust Preferred Subordinated Debentures) believed that the Debtor's estate may hold claims against the Debtor's current and former officers and directors. Wilmington Trust believed that these potential claims included, without limitation, claims arising from breaches of duties owed by the officers and directors to the Debtor, misrepresentation, failures to disclose, and other wrongful acts (the "WTC Claims").

Wilmington Trust alleged that because the Debtor continued to be influenced by its former officers and directors, who may have engaged in the acts or omissions giving rise to the WTC Claims, a potential conflict of interest may arise that would prohibit the Debtor from making a thorough investigation of the WTC Claims. Due to this alleged conflict, Wilmington Trust filed a motion (the "Derivative Standing Motion") requesting that, as the representative for the Debtor's largest single group of unsecured creditors, Wilmington Trust receive derivative standing to investigate, assert, and pursue certain D&O Claims on behalf of the Debtor's estate and its creditors. Wilmington Trust also requested that it receive authorization to hold, assert, and if necessary, waive the attorney-client privilege and work product privilege solely for the benefit of, and on behalf of the Debtor's estate as it investigated, asserted, and pursued the WTC Claims.

Wilmington Trust's Derivative Standing Motion drew objections from both the Debtor and the FDIC. Ultimately, the Bankruptcy Court entered an order on November 5, 2010 (the "Derivative Standing Order"), which provided Wilmington Trust with a narrowly tailored grant of derivative standing to pursue certain claims on behalf of the Debtor's estate. Pursuant to the Derivative Standing Order, Wilmington Trust was provided with derivative standing to investigate all of the Debtor's potential claims against its current and former directors and officers, to the extent that such claims could be covered by the Debtor's D&O Policies, and for which coverage under such policies could otherwise be lost if not timely asserted (the "D&O Claims"). The Derivative Standing Order did not permit Wilmington Trust to

investigate any claims other than the D&O Claims without obtaining additional Bankruptcy Court authorization.

Following entry of the Derivative Standing Order, WTC began its investigation of potential D&O Claims and requested a number of documents from the Debtor, including certain regulatory examination reports prepared by governmental authorities. Many of these regulatory examination reports were subject to federal regulations that prohibited their disclosure to the public without first obtaining either the approval of the corresponding regulatory agency or a court order authorizing their disclosure. Due to the potential conflict between the terms of the Derivative Standing Order and these regulations prohibiting the disclosure of certain sensitive regulatory materials, the Debtor filed an emergency motion with the Bankruptcy Court to obtain clarification regarding whether the Derivative Standing Order permitted the Debtor to disclose regulatory materials to Wilmington Trust, who "stood in the shoes" of the Debtor while investigating D&O Claims on behalf of the Debtor's estate. On November 18, 2010, the Bankruptcy Court issued an order (the "Clarification Order") clarifying the Derivative Standing Order, which provided that the Debtor was authorized to disclose such sensitive regulatory materials to Wilmington Trust, as part of its investigation of D&O Claims.

Since the issuance of the Derivative Standing Order and Clarification Order, Wilmington Trust has diligently pursued an investigation of the D&O Claims. On December 27, 2010, Wilmington Trust sent letters to certain current and former directors and officers of the Debtor and the Bank (the "WTC Demand Letters"), which alleged "breach of … fiduciary duties of care and loyalty to [the Debtor] and failure to perform … duties to [the Debtor] in good faith," and seeking civil damages in the amount of $335 million.

Pursuant to the terms of the Derivative Standing Order, upon the appointment of the Plan Administrator that will oversee administration of the Debtor's Plan, the Plan Administrator will succeed to Wilmington Trust's standing to pursue to the D&O Claims for the benefit of the Debtor's Estate and Liquidating RGFC.

### E.    Motion for Relief from Stay by the Debtor's Officers and Directors

The D&O Policies provided that the Debtor's insurance company would provide coverage for reasonable legal fees and expenses incurred in the defense of any of the Debtor's directors, officers, and/or employees covered by the D&O Policies while defending themselves against various asserted claims.    Although the D&O Policies were owned by the Debtor, those policies either (i) provided insurance coverage only to the directors and officers themselves, or (ii) provided insurance coverage to both the Debtor and its officers and directors, but contained a "priority of payment" provision that required that subordinated the Debtor's rights to receive payment under that policy to the rights of its officers and directors.

In December of 2010, both the FDIC and Wilmington Trust, (pursuant to its powers under the Derivative Standing Order) sent demand letters to many of the Debtor's former officers and directors, which alleged that the officers and directors had committed acts, omissions, and/or breaches of fiduciary duty, which caused the Bank to suffer significant losses.    The allegations in these demand letters constituted a "claim" for purposes of the D&O Policies, which entitled the Debtor's directors and officers to payment of defense costs under the D&O Policies.

The D&O Policies constituted assets of the Debtor's estate, which certain parties asserted were protected by an automatic stay imposed by the Bankruptcy Code.    Consequently, for the avoidance of doubt and at the request of the insurer, the Debtor's directors and officers filed a motion for relief from stay on January 26, 2011 in order to obtain formal court authorization (to the extent required) for the payment of defense costs pursuant to the D&O Policies (the "D&O Lift Stay Motion").    The Bankruptcy Court entered an order (the "D&O Lift Stay Order") on March 25, 2011 granting the relief sought in the D&O Lift Stay Motion, subject to certain modifications.    Under the D&O Lift Stay Order, the Debtor's officers and directors are permitted to obtain payment of defense costs from the Insurance Policy, but must provide full disclosure to the court every three (3) months or when defense costs reach $250,000, whichever comes first.    The D&O Lift Stay Order did not provide any cap on the payment of funds, but did require the disclosures set forth above.

### F. Litigation with the FDIC

The Debtor has filed a complaint in the District Court against the FDIC (the "Receivership Claim Litigation"). In this complaint, the Debtor is seeking, among other things, a determination that the Debtor's proof of claim filed in the FDIC's pending receivership of the Bank is valid and proven claim that should be allowed by law. The Debtor initiated the Receivership Claim after its proof of claim in the FDIC's pending receivership action over the Bank, which sought compensation from the FDIC in an amount not less than $1,992,153.59, was allowed in part, and disallowed in part, without any distribution to the Debtor.

The Receivership Claim Litigation is pending in the District Court and the outcome of that case is uncertain. The Debtor believes that its claims asserted in the FDIC Receivership, if allowed, would likely be beneficial to the Debtor by providing an offset against any Allowed Claims of the FDIC in the Chapter 11 Case. However, an affirmative recovery by the Debtor on such claims from the FDIC Receivership estate is unlikely because of the statutory treatment of such claims, which are subordinated to the claims of depositors of the failed Bank of the FDIC, in its corporate capacity as subrogee for such claims.

### G. Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the date on which the debtor filed for voluntary relief to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan. However, a court may extend these periods upon request of a party in interest and "for cause." The Debtor filed several motions to extend exclusivity in the Chapter 11 Case, which the Bankruptcy Court approved. The Debtor proposed its Plan on or before the May 31, 2011 expiration of its extended plan exclusivity period. The Debtor presently has the exclusive right to solicit acceptances for its Plan through October 31, 2011, which period is subject to future extensions upon request by the Debtor.

603415

# IV.  SUMMARY OF THE PLAN

## A.  Administrative and Priority Tax Claims

### 1.  Administrative Claims

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtor, Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such later time as may be agreed upon by such Holder and Liquidating RGFC or the Plan Administrator, as applicable; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  The Plan establishes an Administrative Claim Bar Date that is the first Business Day thirty days after the Effective Date as the deadline for a Holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim. The Plan defines Effective Date as meaning the first Business Day after the Bankruptcy Court enters an order confirming the Plan (the "Confirmation Order") on which: (a) no stay of such Confirmation Order is in effect, and (b) all of the conditions precedent set forth in Article VIII.B of the Plan have either been satisfied or waived.

### 2.  Priority Tax Claims

The Plan further provides that Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the latest of (i) the Effective Date; (ii) the date such Allowed Priority Tax Claim becomes Allowed; and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

603415

B. **Classification and Treatment of Claims and Interests**

1. **Summary**

The Plan constitutes a chapter 11 plan for the Debtor. Except for Administrative Claims and Priority Tax Claims, all of the Claims against and Interests the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims.

The chart shown below classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date of the Plan.

2. **Summary of Classified Claims and Interests of RGFC**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Notes Claims | Impaired | Yes |
| 6 | RGFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 7 | RGFC Common Stock Interests | Impaired | No (deemed to reject) |

3. **Classification and Treatment of Claims and Interests of RGFC**

Class 1 —Secured Claims

(a)     Classification: Class 1 consists of all Secured Claims.

(b)     Impairment and Voting: Class 1 is Unimpaired by the Plan. Each Holder of a Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

603415

(c)     Treatment: Except to the extent that a Holder of a Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Secured Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, each Holder of an Allowed Secured Claim shall, at the sole option of RGFC, Liquidating RGFC or the Plan Administrator, as applicable: (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Secured Claim Unimpaired, in each case on the later of the Effective Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon as practicable thereafter.

Class 2 —Non-FDIC Priority Claims

(a)     Classification: Class 2 consists of all Non-FDIC Priority Claims.

(b)     Impairment and Voting: Class 2 is Unimpaired by the Plan. Each Holder of a Non-FDIC Priority Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)     Treatment: On or as soon as practicable after the Effective Date, Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Non-FDIC Priority Claim, in full and final satisfaction of such Allowed Non-FDIC Priority Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment, on or as soon as practicable after the latest of (i) the Effective Date; (ii) the date such Allowed Non-FDIC Priority Claim becomes Allowed; and (iii) the date such Allowed Non-FDIC Priority Claim is payable under applicable non-bankruptcy law.

Class 3 —FDIC Claims

(a)     Classification: Class 3 consists of all FDIC Claims.

(b)     Impairment and Voting: Class 3 is Impaired by the Plan. Each Holder of a Claim that, if Allowed, would constitute a FDIC Claim, is entitled to vote to accept or reject the Plan.

(c)     Treatment: In full satisfaction, settlement, release and compromise of and in exchange for each FDIC Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall make the following distributions to each Holder of an Allowed FDIC Claim on the Initial Distribution Date, and each Quarterly Distribution Date thereafter: (i) to the extent that any portion of the Allowed FDIC Claims is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such an Allowed FDIC Claim entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code shall receive a Distribution of all Net Free Cash as such Net Free Cash is available on such distribution date until the portion of the Allowed FDIC Claim that is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code is paid in full; and (ii) with respect to any portion of the Allowed FDIC Claims that is not entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such FDIC Claims shall receive a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.   The Distribution available to holders of Allowed FDIC Claims shall be limited by the value of RGFC's Assets after satisfaction of any Allowed Secured Claims and any Allowed Non-FDIC Priority Claims.

Class 4 —General Unsecured Claims

(a)     Classification: Class 4 consists of all General Unsecured Claims, which means a General Unsecured Claim against RGFC that is not a Subordinated Notes Claim.

(b)     Impairment and Voting: Class 4 is Impaired by the Plan. Each Holder of a Claim that, if Allowed, would constitute a General Unsecured Claim, is entitled to vote to accept or reject the Plan.

(c)     Treatment: In full satisfaction, settlement, release, and compromise of and in exchange for each General Unsecured Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall distribute to each Holder of an Allowed General Unsecured Claim on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.

Class 5 — Subordinated Notes Claims

(a) Classification: Class 5 consists of all Subordinated Notes Claims, which means General Unsecured Claims arising from or relating to the Trust Preferred Subordinated Debentures.

(b) Impairment and Voting: Class 5 is Impaired by the Plan. Each holder of a Claim that, if Allowed, would constitute a Subordinated Notes Claim in Class 5 is entitled to vote to accept or reject the Plan.

(c) Allowance: The Subordinated Notes Claims shall be Allowed in the aggregate amount of $384,996,233.92, which is comprised of (a) $119,069,266.26 on account of the R&G Capital Trust III Debentures; (b) $118,053,644.37 on account of the R&G Capital Trust V Debentures; and (c) $147,873,323.29 on account of the R&G Capital Trust VI Debentures. In accordance with the Plan, and except as provided in Article V.N of the Plan which deals with contractual subordination rights the Allowed Subordinated Notes Claims shall not be subject to any reductions, setoff, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation, *provided, however,* that nothing set forth in the Plan is intended to waive, release or otherwise compromise avoidance actions, if any, arising under chapter 5 of the Bankruptcy Code, or objections, if any, to Subordinated Notes Claims pursuant to section 502(d) of the Bankruptcy Code.

(d) Treatment: In full satisfaction, settlement, release, and compromise of and in exchange for each Subordinated Notes Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall distribute to each Holder of an Allowed Subordinated Notes Claim on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date, provided, however, that any Distribution to Holders of Allowed Subordinated Notes Claims of Residual Net Free Cash shall be redistributed by RGFC or the Plan Administrator, subject to Bankruptcy Rule 3021 and subject to any lien or priority rights of the Indenture Trustees, pursuant to the subordination provisions of the relevant Indentures, as

modified by the terms of the subordination waiver set forth in the FirstBank Settlement. The relative priorities among holders of Allowed Subordinated Notes Claims, and the order in which such Holders are entitled to receive payment of their Allowed Claims, are governed by the relevant Indentures, as modified by the terms of the FirstBank Settlement, and nothing in the Plan is intended to or shall conflict with the contractual subordination and subrogation provisions of such Indentures, as modified by the terms of the FirstBank Settlement, which shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

Class 6 — RGFC Preferred Stock Interests

(a)     Classification: Class 6 consists of all RGFC Preferred Stock Interests.

(b)     Impairment and Voting: Class 6 is Impaired by the Plan. Each Holder of a RGFC Preferred Stock Interest in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)     Treatment: No Holder of RGFC Preferred Stock Interests shall receive any Distribution. As set forth in the Plan, upon the Effective Date, the RGFC Preferred Stock Interests shall be cancelled, terminated and of no further force or effect.

Class 7 — RGFC Common Stock Interests

(a)     Classification: Class 7 consists of all RGFC Common Stock Interests.

(b)     Impairment and Voting: Class 7 is Impaired by the Plan. Each Holder of a RGFC Common Stock Interest in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)     Treatment: No Holder of RGFC Common Stock Interests shall receive any Distribution. As set forth in the Plan, upon the Effective Date, the RGFC Common Stock Interests shall be cancelled, terminated and of no further force or effect.

C.     **Means for Implementation of the Plan**

1.     **Appointment of a Plan Administrator and a Plan Consultant**

The Plan provides that a Plan Administrator and Plan Consultant shall be appointed on the Effective Date. The Plan Administrator is Clifford Zucker, CPA. The Plan Consultant is Wilmington Trust. The duties, powers, and obligations of the Plan Administrator and the Plan Consultant shall be set forth in the Plan Administrator Agreement. Among other things, the Plan Administrator, supervised by and consulting with the Plan Consultant, shall be responsible for implementing the Plan, including monetizing or abandoning all of Liquidating RGFC's assets, pursuing or abandoning all Causes of Action, resolving all Claims, and distributing Net Free Cash and Residual Net Free Cash pursuant to the Plan. The Plan Administrator Agreement is included in the Plan Supplement.

2.     **Fees and Expenses of Liquidating RGFC**

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees or expenses of Liquidating RGFC or the Plan Administrator, as applicable (including, without limitation, the reasonable fees and expenses of professionals retained by Liquidating RGFC or the Plan Administrator), shall be paid in accordance with the Plan Administrator Agreement without further order of the Bankruptcy Court.

3.     **Periodic Reports to Be Filed by Liquidating RGFC**

The Plan Administrator shall file periodic reports regarding the administration of Liquidating RGFC's assets, the Distributions made by it and other matters required to be included in such report in accordance with the Plan Administrator Agreement.

4.     **Directors/Officers of the Debtor on the Effective Date**

In accordance with the Plan, on the Effective Date, the persons then acting as directors, officers, representatives and/or contract managers of the Debtor shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtor or the Chapter 11 Case. Nothing contained in the Plan shall release the Debtor's officers and directors from claims for actions taken before the Effective Date, including, but not limited to, any claims or actions that may be

investigated by Wilmington Trust pursuant to the Derivative Standing Order, other than as provided in Article IX of the Plan.

### 5. Plan Administrator

On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, directors, representatives, contract managers, and shareholders (subject, at all times, to the oversight of the Plan Consultant), and Liquidating RGFC shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator. All property of the Debtor's Estate not Distributed to the Holders of Claims or Interests on the Effective Date shall be transferred to Liquidating RGFC and managed and distributed by the Plan Administrator pursuant to the terms of the Plan Administrator Agreement and the Plan and shall be held in the name of Liquidating RGFC free and clear of all Liens, Claims, charges or other encumbrances against the Debtor and the Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims under the Plan.

As provided in the Plan Administrator Agreement, the Entity chosen to be the Plan Administrator shall have such qualifications and experience to enable it to perform its obligations under the Plan and under the Plan Administrator Agreement. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Plan Consultant shall designate another Entity to become Plan Administrator and such Entity will become the successor Plan Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Plan Administrator. The Plan Administrator's reasonable costs and expenses shall be compensated and reimbursed by Liquidating RGFC as set forth in, and in accordance with, the Plan Administrator Agreement.

The Plan Administrator shall be deemed the representative of the Debtor's Estate in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Plan Administrator Agreement, including, without limitation (and except as otherwise provided in the Plan Administrator Agreement), the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code

603415

and Bankruptcy Rule 2004, including, without limitation, the right to (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Plan Administrator Agreement, (b) prosecute, settle, abandon or compromise any Causes of Action, (c) make Distributions contemplated by the Plan, (d) establish and administer the Disputed Claims Reserve, (e) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court objections to such claims, and (f) employ and compensate professionals and other agents, including one or more of the Professionals.

### 6. Wind Down and Dissolution of the Debtor

The Plan provides that, after the Effective Date, Liquidating RGFC shall remain in existence for the sole purpose of liquidation, distribution and dissolution. On and after the Effective Date, the Plan Administrator shall make Distributions under the Plan and shall implement the dissolution of Liquidating RGFC and monetization of any assets of Liquidating RGFC pursuant to the Plan Administrator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve Liquidating RGFC. As soon as practicable after the Effective Date, the Plan Administrator shall: (a) take any action reasonably necessary to effectuate the Wind Down; (b) file for Liquidating RGFC, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of Liquidating RGFC under applicable non-bankruptcy law; (c) complete and file all final or otherwise required federal, state and local tax returns of the Debtor or Liquidating RGFC, as applicable, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of Liquidating RGFC, the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws; (d) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan; and (e) comply with any regulatory requirements imposed on Liquidating RGFC under applicable law. The filing by the Plan Administrator of a certificate of dissolution on behalf of Liquidating RGFC shall be authorized and approved in all respects without further action under

applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of the Debtor or Liquidating RGFC, as applicable.

7. **Cancellation of Existing Securities and Agreements; Claims of Subordination**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Subordinated Notes Claims and any RGFC Stock Interest, including the Trust Preferred Subordinated Debentures, the Trust Preferred Securities, each RGFC Common Stock Interest and each RGFC Preferred Stock Interest shall be automatically canceled, shall be of no further force or effect, whether surrendered for cancellation or otherwise, and the obligations of the Debtor's Estate thereunder or in any way related thereto shall be terminated.

On the Effective Date, except to the extent otherwise provided in the Plan, any indenture, guarantee or other agreement relating to any of the foregoing, including, without limitation, the Indentures, shall be automatically canceled and terminated, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtor's Estate thereunder shall be terminated.

As of the Effective Date, the transfer register or ledger maintained by the Indenture Trustees for the Trust Preferred Subordinated Debentures and the Trust Preferred Securities shall be closed, and there shall be no further changes in the record Holders of any Trust Preferred Subordinated Debentures or Trust Preferred Securities.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall continue in effect solely for purposes of (i) allowing the Indenture Trustees to receive Distributions under the Plan on behalf of the Holders of the Trust Preferred Subordinated Debentures and Trust Preferred Securities, (ii) thereafter, allowing the Indenture Trustees to make Distributions to Holders of the Trust Preferred Subordinated Debentures and Trust Preferred Securities, (iii) permitting the Indenture Trustees to maintain any rights and charging Liens they may have against Distributions or property held or collected by the Indenture Trustees for fees, costs and expenses pursuant to the Indentures, or for indemnification as provided for under the

Indentures; (iv) permitting the Indenture Trustees to serve as the Plan Consultant after the Effective Date; (v) permitting, but not requiring, the Indenture Trustees to exercise their rights and obligations relating to the interest of their holders pursuant to the applicable Indentures; and (vi) permitting the Indenture Trustees to appear in the Chapter 11 Case. The Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall terminate completely upon completion of all Distributions by the Indenture Trustees to the Holders of the Trust Preferred Subordinated Debentures and the Trust Preferred Securities. The Plan provides that, after the performance by the Indenture Trustees or their respective Representatives of any duties that are required under the Plan, the Confirmation Order, and the Indentures, the Indenture Trustees and their respective Representatives shall be relieved of and released from all obligations arising under the Indentures, and the Indenture Trustees and their respective Representatives shall be fully released and discharged.

The Plan provides that, as a precondition to payment of any Trustee Fees incurred prior to the Effective Date, each Indenture Trustee shall, at any time after the Effective Date and before the date that is thirty (30) days after the Effective Date, submit to Liquidating RGFC or the Plan Administrator, as applicable, and the U.S. Trustee its invoices for payment of such Trustee Fees. Each Indenture Trustee shall also submit a statement reflecting the total amount sought pursuant to such invoice to each other Indenture Trustee. Liquidating RGFC or the Plan Administrator, as applicable, shall, as soon as practicable thereafter, but in no event earlier than fourteen (14) days after receipt thereof, and unless the Plan Administrator objects thereto or has received an objection thereto from the U.S. Trustee, reimburse the Indenture Trustee in Cash for such Trustee Fees; provided, however, that in exchange for such payment, the Indenture Trustee shall not assert a charging Lien for such payment on any Distribution made to and retained by the Indenture Trustee under the Plan on behalf of the Holders of the Subordinated Notes Claims. In the event any such objection as to reasonableness of the Trustee Fees (which shall be the only basis for objection) is made or received by the Plan Administrator (which objection shall be made in writing and served on the Plan Administrator, the U.S. Trustee, and the Indenture Trustee whose Trustee Fees are the subject of such objection within fourteen (14) days of receipt of the applicable invoice or

603415

statement, but need not be filed with the Bankruptcy Court), Liquidating RGFC or the Plan Administrator, as applicable, shall, as soon as practicable after such objection period has run, reimburse such Indenture Trustee in Cash only for the unobjected to portion of such Trustee Fees. In the event the parties are unable to resolve the objection, the applicable Indenture Trustee may file a motion or application with the Bankruptcy Court in accordance with Article XI.A of the Plan seeking a determination concerning the reasonableness of such Trustee Fees or exercise their charging Lien under the applicable Indenture. Subsequent submissions by an Indenture Trustee of Trustee Fees incurred after the Effective Date may be made from time to time, but no more frequently than monthly, in the same manner (and with the same objection and payment procedures) as set forth above. Nothing in the Plan shall be construed as an agreement by an Indenture Trustee to a waiver of its charging Lien for any amounts not paid pursuant to Article IV.G.5 in the Plan, including, without limitation, any fees and expenses (including the fees and expenses of its professionals) accrued prior to or after the Petition Date. The Plan further provides that in the event an Indenture Trustee chooses to exercise its charging Lien rather than seek payment through the provisions of Article IV.G.5 in the Plan, such Indenture Trustee may do so through a deduction in amounts received in any Distribution and no other filings or requests shall be necessary.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Plan Administrator shall be deemed the holder of all equity interests in Liquidating RGFC on and after the Effective Date solely to effectuate the terms of the Plan, provided, however, that, notwithstanding any provisions to the contrary contained in the Plan or Plan Administrator Agreement, the Plan Administrator shall not sell, convey or otherwise transfer any equity interest in Liquidating RGFC absent: (a) the filing of a motion with the Bankruptcy Court; (b) notice to the Plan Consultant; (c) entry of any order by the Bankruptcy Court authorizing any such sale, conveyance or other transfer in accordance with Article IV.E.1 of the Plan; (d) the filing of all appropriate forms by Liquidating RGFC, prior to any such sale, conveyance or transfer, terminating any continuing reporting obligations under the Securities and Exchange Act of 1934, and any regulations promulgated thereunder; and (e) confirmation that such sale, conveyance or transfer

would not result in Liquidating RGFC becoming a public reporting company under the Securities and Exchange Act of 1934, and any regulations promulgated thereunder, and (f) compliance with federal securities laws.

### 8.  Vesting of Assets in Liquidating RGFC

Except as otherwise provided in the Plan (including, without limitation Article IX.F) or in any agreement, instrument or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Debtor's Estate and any property acquired by the Debtor pursuant to the Plan shall vest in Liquidating RGFC, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be provided in the Plan, the Plan Administrator Agreement or the Confirmation Order, on and after the Effective Date, Liquidating RGFC may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 9.  Deregistration

As soon after the Effective Date as is practicable, the Plan Administrator shall take such action as is reasonably necessary to relieve Liquidating RGFC of the obligation to file periodic reports with the United States Securities and Exchange Commission or to otherwise comply with the statutory or regulatory requirements of a publicly traded company, including, but not limited to, seeking to deregister each RGFC Stock Interest.

### 10.  Merger/Dissolution/Consolidation

On or as of the Effective Date or as soon as practicable thereafter, and without the need for any consent or approval, the Plan Administrator may, in its sole and absolute discretion, (i) take appropriate corporate action in its capacity as the sole shareholder of Liquidating RGFC to replace or appoint officers and directors of Liquidating RGFC or any subsidiaries controlled by Liquidating RGFC including, without limitation, RAC; (ii) take any other appropriate actions with respect to Liquidating RGFC, RAC, or any of Liquidating RGFC's other subsidiaries; (iii) cause any of Liquidating RGFC's subsidiaries to be

merged, dissolved, or otherwise consolidated with each other or with Liquidating RGFC, or (iv) engage in any other transaction with respect to Liquidating RGFC and its subsidiaries in furtherance of the Plan.

### D. Provisions Governing Distribution

#### 1. Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, Liquidating RGFC or the Plan Administrator, as applicable, shall make the Distributions required to be made under the Plan.

#### 2. Disputed Claims Reserve

##### i. *Establishment of Disputed Claims Reserve*

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, Liquidating RGFC or the Plan Administrator, as applicable shall establish a separate Disputed Claims Reserve for Disputed Claims, which Disputed Claims Reserve shall be administered by the Plan Administrator. Liquidating RGFC or the Plan Administrator, as applicable, shall reserve in Cash the amount Holders of Disputed Claims would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VI.D of the Plan).

##### ii. *Maintenance of Disputed Claims Reserve*

To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash may, at the Plan Administrator's discretion, be deposited in an interest-bearing account. Liquidating RGFC or the Plan Administrator, as applicable, shall hold Cash in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed. The Plan Administrator shall, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan and in the Plan Administrator Agreement, as such Disputed Claims are resolved by a Final Order, and such amounts will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

603415

### 3. Quarterly Distributions

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, Liquidating RGFC or the Plan Administrator, as applicable, shall make the Distributions required to be made under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by Liquidating RGFC as applicable, in the Disputed Claims Reserve pursuant to Article V.B.2 of the Plan and Distributed on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with Article V.C of the Plan.

### 4. Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date (which is two Business Days after the Confirmation Date) will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. Liquidating RGFC shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, Liquidating RGFC as applicable, shall be entitled instead to recognize and deal with, for all purposes under the Plan, only the Entity that is listed on the Proof of Claim Filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to Liquidating RGFC as applicable, as of the Distribution Record Date.

### 5. Delivery of Distributions

#### iii. *General Provisions; Undeliverable Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the Holders of Allowed Claims shall be made by Liquidating RGFC or the Plan Administrator, as applicable, at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address

set forth on Proofs of Claim Filed by such Holder or (ii) the last known address of such Holder if no Proof of Claim is Filed or if the Debtor, Liquidating RGFC or the Plan Administrator, as applicable, has been notified in writing of a change of address; provided, however, that Distributions paid by Liquidating RGFC or the Plan Administrator, as applicable, for the benefit of Holders of Subordinated Notes Claims shall be made to the appropriate Indenture Trustee under the respective Indenture documents for such obligations. Each such Indenture Trustee may, in turn, establish a record date for Distributions and administer the Distributions to the respective holders of Allowed Claims in accordance with the Plan and the applicable Indentures. The Indenture Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The Indenture Trustees shall only be required to make Distributions in accordance with the terms of the Plan and the respective Indenture and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to the Indenture Trustees in accordance with the Plan, except for liabilities resulting from their own gross negligence or willful misconduct.

If any Distribution is returned as undeliverable, Liquidating RGFC or the Plan Administrator, as applicable, as applicable, may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as Liquidating RGFC or the Plan Administrator, as applicable, deems appropriate, but no Distribution to any Holder shall be made unless and until Liquidating RGFC or the Plan Administrator, as applicable, has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest. Amounts in respect of any undeliverable Distributions made by Liquidating RGFC or the Plan Administrator, as applicable, shall be returned to, and held in trust by, Liquidating RGFC or the Plan Administrator, as applicable, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in the Plan. Liquidating RGFC or the Plan Administrator, as applicable, shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Plan Administrator Agreement.

603415

The Indenture Trustees shall only be required to act and make Distributions in accordance with the terms of the Plan and applicable Indenture documents and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim as of the Distribution Record Date or who does not otherwise comply with the Plan.

<em>iv.    Unclaimed Property</em>

Except with respect to property not Distributed because it is being held in the Disputed Claims Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in Liquidating RGFC, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of such one-year period, the Claim of any Entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require Liquidating RGFC to attempt to locate any Holder of an Allowed Claim. Except as otherwise provided in the Plan, all funds or other property that vests or revests in Liquidating RGFC pursuant to the Plan shall be distributed by the Plan Administrator in accordance with the provisions of the Plan or the Plan Administrator Agreement.

**6.    Surrender of Canceled Instruments and Securities**

i.    Generally

Except to the extent evidenced by electronic entry, as a condition of receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the appropriate Indenture Trustee or the Plan Administrator or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver to the appropriate Indenture Trustee or the Plan Administrator to such party an affidavit of loss and/or indemnity reasonably satisfactory before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan. Any Distribution so forfeited shall

become the property of the Plan Administrator for Distribution to Holders of Allowed Claims in accordance with the terms and provisions of the Plan.

*ii.      Failure to Surrender Canceled Instruments*

If any Holder of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to the Plan, fails to surrender such instrument, security or other documentation or comply with the provisions of the Plan within one year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such Holder shall be forever barred from asserting such Claim against Liquidating RGFC or its property. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in the Plan.

**7.      Manner of Cash Payments Under the Plan or the Plan Administrator Agreement**

Cash payments made pursuant to the Plan or the Plan Administrator Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

**8.      Time Bar to Cash Payments by Check**

Checks issued by Liquidating RGFC on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to the Plan shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued. Any claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Initial Distribution Date or Quarterly Distribution Date on which such check was issued. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of Liquidating RGFC as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in the Plan.

9.      **Compliance with Tax Requirements**

In connection with making Distributions under the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Plan Administrator to the appropriate authority. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

10.     **No Payments of Fractional Dollars**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

11.     **Interest on Claims**

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if the Disputed Claim becomes an Allowed Claim Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

603415

### 12.     No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### 13.     Setoff and Recoupment

Liquidating RGFC or the Plan Administrator, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or Liquidating RGFC may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or Liquidating RGFC of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

### 14.     Contractual Subordination Rights

Prior to entry of the FirstBank Settlement, the Debtor's obligations relating to the Trust Preferred Subordinated Debentures were structurally subordinated to certain of the Debtor's pre-petition long term indebtedness, including the Debtor's pre-petition debts to FirstBank. Following entry of the FirstBank settlement, through which FirstBank's claims against the Debtor were satisfied in full, and FirstBank's subordination rights under the Trust Preferred Subordinated Debentures were released, the Debtor is not aware any other debts to which its obligations under the Trust Preferred Subordinated Debentures would be subordinate. Nevertheless, notwithstanding anything in the Plan or any annex, attachment, schedule or exhibit to the Plan, but subject to the terms of the FirstBank Settlement, the subordination rights in respect of the Trust Preferred Subordinated Debentures shall be controlled and governed by the Indentures providing for and relating to such subordination rights and nothing in the Plan or any annex, attachment, schedule or exhibit to the Plan, shall amend, modify or impair such rights (or any remedies in respect thereof) in any manner or fashion, provided however, for the avoidance of doubt, the subordination provisions in respect of the Trust Preferred Subordinated Debentures shall be subject to the terms of the FirstBank Settlement.

603415

E.    **Disputed Claims**

1.    **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, the Plan Administrator shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

2.    **Resolution of Disputed Claims**

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Plan Administrator shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by Liquidating RGFC.

3.    **Objection Deadline**

All objections to Disputed Claims shall be Filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date (which is six months after the Effective Date of the Plan), unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

4.    **Estimation of Claims**

At any time, subsequent to the Effective Date, Liquidating RGFC or the Plan Administrator, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtor, Liquidating RGFC or the Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.

5.    **Disallowance of Claims**

Except as otherwise agreed, any and all Proofs of Claim Filed after the Bar Date (which for most non-governmental claimants was September 21, 2010) shall be deemed disallowed and expunged as of

the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

F.     **Treatment of Executory Contracts and Unexpired Leases**

1.     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Any executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, or that are to be assumed pursuant to the terms of the Plan, shall be deemed assumed by the Debtor as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

The Plan shall constitute a motion to reject all executory contracts and unexpired leases not listed as assumed executory contracts or unexpired leases in the Plan Supplement, and the Debtor or Liquidating RGFC, as applicable, shall have no further liability thereunder except with respect to Claims created by the rejection as set forth in Article VII of the Plan. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination that the rejection thereof is in the best interests of the Debtor, its Estate and all parties in interest in the Chapter 11 Case.

2.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed against the Debtor with the Bankruptcy Court and served on Liquidating RGFC no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, Liquidating RGFC, the Debtor's Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims

shall, as of thirty-one (31) days after the Effective Date, be subject to the permanent injunction provided for in Article IX.D of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated under the Plan as General Unsecured Claims and shall be subject to the provisions of Article III of the Plan.

G. **Conditions Precedent to Confirmation and the Effective Date**

1. **Conditions to Confirmation**

The following are conditions precedent to entry of the Confirmation Order that must be satisfied or waived in accordance with Article VIII of the Plan:

(a) The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

(b) All objections to confirmation of the Plan are either withdrawn, resolved or overruled.

(c) The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed.

2. **Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII of the Plan:

(a) The Confirmation Order shall not be stayed and shall be in full force and effect, and shall include, inter alia, the provisions of Article IX.F, *in haec verba*.

(b) The Plan Consultant and the Plan Administrator shall have been appointed in accordance with the terms of the Plan and the Plan Administrator Agreement.

3. **Waiver of Conditions Precedent**

The Debtor, with the consent of Wilmington Trust, may waive the occurrence of or modify any condition precedent in the Plan. Any such written waiver of a condition precedent may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights

shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### H. Release, Injunction, and Related Provisions

#### 1. Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided by the Plan, the Plan shall constitute a good faith compromise of all Claims and Interests. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtor, its Estate, and the holders of Claims and Interests.

#### 2. Exculpation

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Case; provided, however, that the foregoing provisions shall (a) have no effect on the liability of any Exculpated Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct; and (b) not preclude any Entity from objecting to Accrued Professional Compensation or fees and expenses previously awarded that if unpaid would constitute Accrued Professional Compensation or Trustee Fees.**

603415

Exculpated Parties is defined in the Plan as meaning, collectively, the Debtor, the board of directors and individual directors and board committees of the Debtor during the Chapter 11 Case, any officer, contract manager, or employee of the Debtor during the Chapter 11 Case, the Indenture Trustees (i.e., the Senior Indenture Trustees and the Subordinated Indenture Trustees), and each of their respective Representatives. "Representatives" is defined in the Plan to include, with regard to an Entity, officers, directors, members, employees, advisors, attorneys, contract managers or representatives, accountants and agents, and their respective professional firms.

3.  No Release of Co-Obligor or Joint Tortfeasor

No provision of the Plan, including, without limitation, any release or exculpation provision, shall modify, release, or otherwise limit the liability of any Entity other than the Exculpated Parties, including, without limitation, any Entity that is a co- obligor, guarantor or joint tortfeasor of an Exculpated Party or that otherwise is liable under theories of vicarious or other derivative liability.

4.  Preservation of Rights of Action

i.  Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest upon the Effective Date in Liquidating RGFC.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Plan Administrator shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action, in accordance with the terms of the Plan Administrator Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in any of the Chapter 11 Case. Without limiting the generality of the foregoing, upon the Effective Date, the Plan Administrator, or Liquidating RGFC, as applicable, shall be deemed substituted for the Debtor in any pending adversary proceedings to which the Debtor was a party, and any appeals arising out of such adversary proceedings. In accordance with the terms of the

Derivative Standing Order, the Plan Administrator shall succeed to and replace Wilmington Trust's standing to pursue any claims, investigations, or causes of action being pursued by Wilmington Trust in accordance with the Derivative Standing Order, and Wilmington Trust's standing and authority to pursue such claims will terminate, as set forth in the Derivative Standing Order.

Causes of Action and any recoveries therefrom shall remain the sole property of Liquidating RGFC (for the sole benefit of Entities entitled to Distributions under the Plan), as the case may be, and Holders of Claims shall have no right to any such recovery.

ii.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), Liquidating RGFC and the Plan Administrator expressly reserve such Cause of Action for later adjudication by Liquidating RGFC or the Plan Administrator (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtor, Liquidating RGFC or the Plan Administrator may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor, Liquidating RGFC or the Plan Administrator at this time or facts or circumstances which may change or be different from those the Debtor, Liquidating RGFC or the Plan Administrator now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or occurrence of the Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order). In addition, the Debtor, Liquidating RGFC and the Plan Administrator expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtor or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or leased equipment or property from the Debtor, should assume that any such obligation, transfer, or transaction may be reviewed by the Plan Administrator subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a Proof of Claim against the Debtor in the Chapter 11 Case; (ii) the Debtor, Liquidating RGFC or the Plan Administrator have objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor, Liquidating RGFC or the Plan Administrator have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtor, Liquidating RGFC or the Plan Administrator as disputed, contingent or unliquidated.

### 5. Release and Injunction

**The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor's Estate and any assets or properties of the Debtor's Estate and/or Liquidating RGFC. On the Effective Date, all such Claims against, and Interests in, the Debtor's Estate shall be satisfied and released in full.**

**Except as otherwise provided in the Plan, any Entity that has held, holds or may hold Claims against or Interests in the Debtor is permanently enjoined from taking any of the following actions against the Debtor's Estate and property thereof, the Plan Administrator, or any other assets or properties of the Debtor or Liquidating RGFC on account of any such Claims or Interests:**

(i) **commencing or continuing, in any manner or in any place, any suit, action or other proceeding;**

(ii) **enforcing, attaching, collecting or recovering in any manner or in any place, any judgment, award, decree or order;**

(iii) creating, perfecting or enforcing any Lien or encumbrance;

(iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor; and

(v) commencing or continuing, in any manner or in any place, any suit, action or other proceeding that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such Entity from exercising its rights pursuant to and consistent with the terms of this Plan.

### 6.    Injunction Against Interference with the Plan

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except with respect to actions any such entity may take in connection with the pursuit of appellate rights with respect to the Confirmation Order.

### 7.    Reservation of Litigation Rights

Notwithstanding anything herein to the contrary, no provision of this Plan or the Confirmation Order (including without limitation Sections IV.H, IX.C and IX.D) shall have the effect of prejudicing, impairing, enhancing, or altering in any respect:

(i) any rights, defenses, setoffs or counterclaims that may be asserted by the Debtors' current or former officers and directors, solely on a defensive basis and not for any affirmative recovery, in respect of any Causes of Action that will vest in Liquidating RGFC pursuant to Sections IV.H and IX.C hereof and that may be brought against them by the Plan Administrator or Liquidating RGFC;

(ii) any rights, defenses, or Causes of Action of the Debtor that will vest in Liquidating RGFC pursuant to Sections IV.H and IX.C hereof, it being understood that the effect of the Plan and Confirmation Order is to be "litigation neutral" with respect to all such rights, defenses or Causes of Action.

603415

### 8. Releases of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged (except for the charging Liens of the Indenture Trustees to the extent the Trustee Fees or any other fees owed to the Indenture Trustees under the Indentures are not paid pursuant to the Plan) and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to Liquidating RGFC and the Plan Administrator.

### I. No Discharge for the Debtor

In accordance with the Plan, the Debtor is not obtaining a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code, and nothing in the Plan shall be interpreted as giving or providing the Debtor with such a discharge.

### J. United States Securities and Exchange Commission

Nothing in the Plan or the Confirmation Order is intended to, or shall be construed as restricting or otherwise limiting the ability of the United States Securities and Exchange Commission to perform its statutory duties with respect to any person or Entity in any nonbankruptcy forum, pursuant to otherwise applicable law.

### K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor, Liquidating RGFC, the Plan Administrator and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtor or Liquidating RGFC, as applicable, is a party or with respect to which the Debtor or Liquidating RGFC, as applicable, may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI of the Plan adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by Liquidating RGFC or the Plan Administrator after the Effective Date, provided, however, that Liquidating RGFC and the Plan Administrator shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX.A and Article IX.C of the Plan;

10.      enforce the injunction set forth in Article IX.D of the Plan;

11.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.      correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes, intent and effect of this Plan;

14.      modify any provision of this Plan to the fullest extent permitted by the Bankruptcy Code;

15.      determine any amendments to the Schedules;

16.      resolve any other matters that may arise in connection with or relate to the Plan Administrator Agreement, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

17.      enter an order and/or the decree contemplated in section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 concluding the Chapter 11 Case.

**L.      Miscellaneous Provisions**

**1.      Final Fee Applications and Initial Trustee Fees**

In accordance with the Plan, the deadline for submission by Professionals of applications for Bankruptcy Court approval of Accrued Professional Compensation, and by each Indenture Trustee for payment of any disputed Trustee Fees incurred on or before the Effective Date, is 30 days after the Effective Date.

### 2. Payment of Statutory Fees

Notwithstanding any other provision of the Plan, the Debtor shall pay within ten days after the Effective Date all fees incurred under 28 U.S.C. § 1930(a)(6) attributable to the Debtor for the period ending on the Effective Date. For the period commencing on the Effective Date through the earlier of (a) the closing of the Bankruptcy Case by the issuance of a final decree by the Bankruptcy Court and (b) entry of an order dismissing or converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the Plan Administrator shall (x) file with the Bankruptcy Court the quarterly operating reports regarding Liquidating RGFC for the post-confirmation period and (y) pay all fees incurred under 28 U.S.C. § 1930(a)(6) based on the disbursements made pursuant to the Plan.

### 3. Modification of Plan

Subject to the limitations contained in the Plan: (1) the Debtor, with the consent of Wilmington Trust, reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtor, Liquidating RGFC or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4. Revocation of Plan

The Debtor reserves the right to withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Debtor withdraws the Plan, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Interests in, the Debtor or any other Entity;

(b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

## 5.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## 6.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Puerto Rico, without giving effect to the principles of conflict of laws thereof.

## 7.    Reservation of Rights

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained therein, nor the taking of any action by the Debtor or any Entity with respect to the Plan shall be deemed to be an admission or waiver of any rights of (i) the Debtor with respect to the Holders of Claims or Interests or other parties-in-interest; or (ii) any Holder of a Claim or other party-in-interest prior to the Effective Date.

## 8.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

603415

### 9. Directors and Officers Liability Insurance

Notwithstanding anything herein to the contrary, no provision of this Plan or the Confirmation Order shall have the effect of prejudicing or impairing in any respect the rights of RGFC's current or former directors and officers to receive payments of defense costs from RGFC's directors' and officers' liability insurance policies (collectively, the "Policies"), in accordance with the terms of such Policies. The Confirmation Order shall provide that the periodic reporting obligations for defense expenses, fees, and/or costs contained in the Bankruptcy Court's March 25, 2011 order modifying the automatic stay (to the extent applicable) to permit payment of such defense costs [ECF No. 283] shall terminate on the Effective Date; provided however, that the Plan Administrator shall be given 60 days' advance written notice solely as to expenditures from the Policies for payment or satisfaction of any settlement or judgment.

### 10. Further Assurances

The Debtor, Liquidating RGFC, the Plan Administrator, all Holders of Claims receiving Distributions under the Plan, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 11. Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor, Plan Administrator, or Wilmington Trust shall be sent by first class U.S. mail, postage prepaid as follows:

603415

To the Debtor:

        R&G Financial Corporation
        1225 Ponce de Leon
        VIG Tower, Suite 106
        San Juan, PR 00907

        *with a copy to:*

        PATTON BOGGS, LLP
        Attn:  Brent McIlwain
        2000 McKinney Avenue, Suite 1700
        Dallas, Texas, 75201
        Telephone:    (214) 758-1500
        Fax:        (214) 758-1550
        Email:  bmcilwain@pattonboggs.com

        -and-

        PIETRANTONI MENDEZ & ALVAREZ, LLP
        Attn:  Jorge I. Peirats
        209 Muñoz Rivera Avenue, 19th Floor
        San Juan, Puerto Rico  00918
        Telephone:    (787) 274-1212
        Fax:        (787) 274-1470
        Email:  jpeirats@pmalaw.com

To Wilmington Trust:

        Kilpatrick Townsend & Stockton LLP
        1100 Peachtree Street, Suite 2800
        Atlanta, Georgia 30309
        Attn:  Todd C. Meyers
        Attn:  Mark A. Fink
        Telephone:    (404) 815-6500
        Fax:        (404) 815-6555
        Email:  tmeyers@kilpatrickstockton.com

To the Plan Administrator:

        Clifford Zucker
        J.H. Cohn LLP
        333 Thornall Street
        Edison, NJ 08837
        Telephone:    (732) 549-0700
        Email:  czucker@jhcohn.com

12. **Filing of Additional Documents**

On or before the Effective Date, the Debtor or Liquidating RGFC, as applicable, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13. **Aid and Recognition**

The Debtor, Liquidating RGFC or the Plan Administrator, as the case may be, shall, as needed to effect the terms of the Plan, request the aid and recognition of any court or judicial, regulatory or administrative body in any nation, province or state.

14. **Document Retention**

From and after the Effective Date, the Debtor, Liquidating RGFC, the Plan Administrator, and any transferee of the Debtor's documents, as the case may be, shall preserve and maintain all of the documents, whether retained by the Debtor or any successor to the Debtor, or transferred to Liquidating RGFC, the Plan Administrator pursuant to the Plan Administrator Agreement, or such other transferee pursuant to the Plan; and any successors to the Debtor, Liquidating RGFC, the Plan Administrator and/or such other transferee shall not destroy or otherwise abandon any such documents absent further order of this Court or a court of competent jurisdiction after a hearing upon notice to parties in interest with an opportunity to be heard.

## V. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a summary of the confirmation process for a Chapter 11 plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

### A. The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation.

**B.** **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1. The Plan complies with all applicable provisions of the Bankruptcy Code.

2. The Debtor, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

5. Each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code. Each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

6.      Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

7.      Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (a) Holders of Administrative Claims will receive, on account of such Claims, Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; (b) Holders of Claims specified in section 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code will receive Cash on the Effective Date equal to the Allowed amount of such Claim; and (c) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim over a period ending not later than five years after the Petition Date. Holders of Allowed FDIC Priority Claims shall receive periodic payments of Net Free Cash until such Allowed Claim is paid in full.

8.      At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

9.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization (which it does in this instance).

10.     The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

11.     In addition to the filing fees paid to the clerk of the Bankruptcy Court, quarterly fees will be paid no later than the last day of the calendar month following the calendar quarter for

which the fee is owed in the Debtor's Chapter 11 Case for each quarter to the U.S. Trustee, until the Chapter 11 Case is closed, converted, or dismissed, whichever occurs first.

### C. Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the Debtor, unless such liquidation is proposed in the Plan. The Plan contemplates that all assets of the Debtor ultimately will be disposed of and all proceeds of the assets will be distributed to the Holders of Allowed Claims pursuant to the terms of the Plan. Since no further reorganization of the Debtor will be possible, the Debtor believes that the Plan meets the feasibility requirement. In addition, based upon the proceeds resulting from the liquidation, the Debtor believes that sufficient funds will exist at confirmation to make the payments required by the Plan.

### D. Best Interest of Creditors Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Debtor's Chapter 11 Case were converted to a liquidation case under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the Debtor's assets into Cash. The Debtor's "liquidation value" would consist primarily of the following: (i) unencumbered and unrestricted Cash held by the Debtor at the time of the conversion to chapter 7 cases; (ii) the proceeds resulting from the chapter 7 trustee's sale of the Debtor's remaining unencumbered assets; (iii) the value associated with the

Debtor's litigation with the FDIC regarding the Debtor's proof of claim filed in the Bank's receivership action as described above in Article III; and (iv) the value (if any) of alleged claims against the Debtor's former officers and directors pursued by Wilmington Trust pursuant to the Derivative standing Order, as described above in Article III of this Disclosure Statement. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtor (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims under the Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Debtor's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full.

Of the foregoing groups of Claims, Classes 1 and 2 for RGFC are "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims are conclusively presumed to accept the Plan. The remainder of the Classes of Claims and Interests are "Impaired" under the Plan and are either entitled to vote on, or conclusively presumed to reject, the Plan. Because the Bankruptcy Code requires that Holders of Claims in voting Classes either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, the Holders of Impaired Claims and Interests will receive more or less than under the Plan. If the probable distribution to Holders of Impaired Claims and Interests under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of Holders of Impaired Claims and Interests.

Based upon the conclusions set forth in the Liquidation Analysis, attached to this Disclosure Statement as Exhibit B, the Debtor believes that the value of distributions, if any, in a hypothetical chapter 7 liquidation to Holders of Allowed General Unsecured Claims and Interests would be less than or equal to the value of distributions to such Holders under the Plan. The Debtor believes that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

### E. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii) provides that, on the Effective Date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 2 for RGFC are not Impaired under the Plan, and, as a result, the Holders of such Claims are conclusively presumed to have accepted the Plan.

The voting Classes are Impaired under the Plan, and the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and

equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

### F. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or conclusively presumed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

#### 1. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2. Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to

the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtor will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the conclusively presumed rejection by Classes 6 and 7 for RGFC. To the extent that any of the voting Classes vote to reject the Plan, the Debtor further reserves the right to (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XI of the Plan.

The votes of Holders of Interests in Classes 6 and 7 for RGFC are not being solicited because, as set forth in Article III of the Plan, there will be no distribution to either of these Classes and these Interests will be cancelled.

Notwithstanding the conclusively presumed rejection by Classes 6 and 7 for RGFC or any Class that votes to reject the Plan, the Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VI.  CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

### A.  Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.  Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Interests under its Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.  Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

66

### 3.    The Debtor May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non- accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions precedent as described in Article VIII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a

603415

distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan, or no distribution of property whatsoever under the Plan.

### 4. Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtor believes that its Plan satisfies these requirements and the Debtor may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation of the Plan may result in, among other things, increased expenses relating to Professional Claims.

### 5. The Debtor May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtor reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement and may not be entitled to vote on the Plan.

### 6. The FDIC Has Asserted a Claim under section 365(o) of the Bankruptcy Code

The FDIC has asserted a claim against RGFC under section 365(o) of the Bankruptcy Code in an unliquidated amount (which RGFC vigorously disputes), contending that RGFC's alleged failure to maintain adequate capitalization of the Bank and cure the deficit as required by section 365(o) gives rise to liability to the FDIC. The FDIC also contends that the unliquidated amounts it asserts under section 365(o) are entitled to priority status pursuant to section 507(a)(9) of the Bankruptcy Code. If the FDIC's

section 365(o) claim is allowed, recoveries to the Holders of General Unsecured Claims against RGFC may be materially reduced (with possibly no recovery) or the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code.

7.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur promptly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

8.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims, the outcome of litigation with the FDIC and the results of Wilmington Trust's investigation pursuant to the Derivative Standing Order. The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.      **Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims**

HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

1. **The Debtor Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes**

No less than three unknown factors make certainty of creditor recoveries under the Plan impossible. First, the Debtor cannot know with any certainty, at this time, how much money will be available for distribution to Holders of Allowed Claims after monetization of the Debtor's assets. Second, the Debtor cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed. Third, the Debtor cannot know with any certainty, at this time, the number or size of Claims senior to the voting Classes or unclassified Claims that will ultimately be Allowed.

2. **The Debtor is Involved in Litigation Which, if Adversely Determined, Could Result in Substantially Less Funds Being Available for Distribution**

The Debtor is involved in litigation, including, among other things, the Receivership Claim Litigation described in Article III of this Disclosure Statement. If the Receivership Claim Litigation is determined adversely to the Debtor, substantially less funds will be available to be distributed under the Plan. Additionally, certain litigation claims may not be covered entirely or at all by the Debtor's insurance policies, or their insurance carriers may seek to deny coverage.

C. **Disclosure Statement Disclaimer**

1. **Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2. **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission**

This Disclosure Statement was not filed with the Securities Exchange Commission under the Securities Exchange Act of 1934 and Securities and Exchange Commission Rules or applicable state securities laws. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

603415

### 3. No Legal Advice is being provided in this Disclosure Statement

**This Disclosure Statement is not legal advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to confirmation of the Plan.

### 4. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Interests, or any other parties in interest.

### 5. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Plan Administrator may seek to investigate, file, and prosecute objections to Claims and Interests and may object to Claims after the confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

### 6. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtor or Liquidating RGFC (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action of the Debtor, its Estate, or Liquidating RGFC are specifically or generally identified herein.

### 7. Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date

does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 8. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

### D. Liquidation Under Chapter 7

If no plan can be confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the liquidation analysis is set forth in Article V herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as Exhibit B.

## VII. CERTAIN TAX CONSEQUENCES

THE FOLLOWING DISCUSSION OF CERTAIN TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, COMMONWEALTH, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

603415

**IRS CIRCULAR 230 DISCLOSURE:** TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

Due to the complexity of the transactions described herein and in the Plan, the possibility of changes in law, differences in the nature of the Claims and Interests, differences in the Holders' of Allowed Claims and Interests' methods of accounting (including claimants and interest holders within the same class) and potential for disputes as to legal and factual matters, the tax consequences of the Plan are subject to significant uncertainties. No rulings or determinations by the IRS or Puerto Rico taxing authorities have been obtained or sought by the Debtor with respect to the Plan, and no opinion of counsel has been obtained with respect to the tax aspects of the Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE POTENTIAL TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN MANY RESPECTS, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN THAT ARE RELEVANT TO THEIR PARTICULAR CIRCUMSTANCES. THIS DISCLOSURE STATEMENT IS NOT A SUBSTITUTE FOR CAREFUL PLANNING WITH A TAX PROFESSIONAL.

## VIII. PLAN SUPPLEMENT

The Plan Supplement will be filed with the Bankruptcy Court no later than five days prior to the Plan voting deadline. The Plan Supplement will include, among other things, (1) the Plan Administrator Agreement; (2) a list of the executory contracts and unexpired leases, if any, to be assumed or rejected pursuant to the Plan; (3) a non-exclusive list of Causes of Action; and (4) the charters of each of the

603415

entities comprising Liquidating RGFC. The Debtor reserves the right to modify the Plan Supplement through and including the Effective Date.

## IX. CONCLUSION AND RECOMMENDATION

The Debtor believes that its Plan is in the best interest of Holders of all Claims and urges all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots, as applicable, so that they will be received by the Voting Agent by the voting deadline.

Dated: September 6, 2011

Respectfully submitted,
R&G FINANCIAL CORPORATION

603415