UNITED STATES BANKRUPTCY COURT

DISTRICT OF PUERTO RICO

| | |
|---|---|
| R&G FINANCIAL CORPORATION | CASE NO   10-04124-11 (ESL) |
| DEBTOR | CHAPTER 11 |

**DISCLOSURE STATEMENT FOR THE DEBTOR'S FIRST AMENDED
CHAPTER 11 PLAN OF LIQUIDATION**

Robert W. Jones
Brent McIlwain
Patton Boggs LLP
2000 McKinney Avenue, Suite 1700
Dallas, Texas  75201
Telephone: (214) 758-1500
Facsimile:  (214) 758-1550
rwjones@pattonboggs.com
bmcilwain@pattonboggs.com

Jorge I. Peirats, Esq.
Pietrantoni Mendez & Alvarez, LLP
Popular Center, 19th Floor
209 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Telephone: (787) 274-1212
Facsimile:  (787) 274-1470
jpeirats@pmalaw.com

Counsel for the R&G Financial Corporation,
Debtor and Debtor-in-Possession

Dated: May 31,September 6, 2011

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS. THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. R&G FINANCIAL CORPORATION, THE DEBTOR AND DEBTOR-IN-POSSESSION (THE "DEBTOR") BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, OR THE PLAN SUPPLEMENT SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE DEBTOR CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

ALTHOUGH THE DEBTOR HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

PLEASE REFER TO ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

UNLESS OTHERWISE SPECIFICALLY INDICATED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED ON AN ANALYSIS OF DATA AND DOCUMENTS AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [_____],NOVEMBER 29, 2011, AT [_____] 2:00 P.M. PREVAILING ATLANTIC TIME AT COURTROOM 2, UNITED STATES POST OFFICE & COURTHOUSE, 300 RECINTO SUR STREET, SAN JUAN, PUERTO RICO 00901. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING FILED BY THE DEBTOR.**

**TO BE COUNTED, THE BALLOTS UPON WHICH HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENTSOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTOR.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____],NOVEMBER 17, 2011, IN ACCORDANCE WITH THE DISCLOSURE STATEMENTSOLICITATION PROCEDURES ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE**

**WITH THE ~~DISCLOSURE STATEMENT~~SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE DEBTOR'S EXPECTATIONS ABOUT FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, PARTICULARLY IN LIGHT OF THE CURRENT WORLDWIDE FINANCIAL AND CREDIT CRISIS, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM FILINGS OF THE DEBTOR OR THAT WAS OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING DISTRIBUTIONS UNDER THE PLAN. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE ARE THE FOLLOWING: (1) THE DEBTOR'S ABILITY TO DEVELOP, PROSECUTE, CONFIRM, AND CONSUMMATE A PLAN WITH RESPECT TO THIS CHAPTER 11 CASE; (2) THE OUTCOME AND TIMING OF EFFORTS TO LIQUIDATE CERTAIN ASSETS OF THE DEBTOR; AND (3) THE OUTCOME OF LITIGATION WITH THE FDIC, CERTAIN FORMER OFFICERS AND DIRECTORS OF THE DEBTOR AND VARIOUS OTHER PARTIES.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE DEBTOR IS UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIMS ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

# TABLE OF CONTENTS

I.      **SUMMARY** .......................................................................................... 1

    A.     **Overview of Chapter 11** .................................................... 1

    B.     **The Purpose and Effect of the Plan** ............................... 2

    C.     **Treatment of Claims and Interests Under the Plan** ....... 2
        1.     **Summary of Classified Claims and Interests of RGFC** ...... 3
        2.     **Unclassified Claims** .................................................. 4
        3.     **Summary of Classification, Treatment and Projected Recoveries of Classified Claims and Interests** ....... 4

    D.     **Claims Estimates** ............................................................. ~~5~~6

    E.     **Transactions Contemplated by the Plan** ......................... 6

    F.     **Consummation** ................................................................ ~~6~~7

    G.     **Liquidation Analysis** ........................................................ 7

    H.     **Risk Factors** .................................................................... ~~7~~8

    I.     **Voting and Confirmation** ................................................. 8

II.     **BACKGROUND TO THE CHAPTER 11 CASE** ...................... ~~9~~10

    A.     **The Debtor's Business** ..................................................... ~~9~~10

    B.     **Debt Structure** ................................................................ 12
        1.     **FirstBank Secured Indebtedness** ............................. 12
        2.     **Trust Preferred Subordinated Debentures** ............... 13

    C.     **Stock** ................................................................................ ~~13~~14

III.     **THE CHAPTER 11 CASE** ..................................................... 14

    A.     **General Case Administration Matters** ............................ 14

    B.     **FirstBank Settlement Agreement** ................................... 16

    C.     **Motion to Extend the Automatic Stay** ............................ ~~17~~18

    D.     **Wilmington Trust Company's Derivative Standing Investigation** .... ~~18~~19

    E.     **Motion for Relief from Stay by the Debtor's Officers and Directors** .... ~~20~~21

    F.     **Litigation with the FDIC** ................................................ ~~21~~22

    G.     **Exclusivity** ....................................................................... 22

IV.     **SUMMARY OF THE PLAN** ................................................. ~~22~~23

    A.     **Administrative and Priority Tax Claims** ........................ ~~22~~23
        1.     **Administrative Claims** ............................................. ~~22~~23
        2.     **Priority Tax Claims** ................................................. 23

    B.     **Classification and Treatment of Claims and Interests** .... ~~23~~24

603415

|  | 1. | Summary | 2324 |
|  | 2. | Summary of Classified Claims and Interests of RGFC | 24 |
|  | 3. | Classification and Treatment of Claims and Interests of RGFC | 24 |
| C. | | Means for Implementation of the Plan | 2829 |
|  | 1. | Appointment of a Plan Administrator and a Plan ~~Committee~~ ~~28~~Consultant29 |  |
|  | 2. | Fees and Expenses of Liquidating RGFC | 2829 |
|  | 3. | Periodic Reports to Be Filed by Liquidating RGFC | 29 |
|  | 4. | Directors/Officers of the Debtor on the Effective Date | 29 |
|  | 5. | Plan Administrator | 2930 |
|  | 6. | Wind Down and Dissolution of the Debtor | 3031 |
|  | 7. | Cancellation of Existing Securities and Agreements; Claims of Subordination | 3132 |
|  | 8. | Vesting of Assets in Liquidating RGFC | 3435 |
|  | 9. | Deregistration | 3435 |
|  | 10. | Merger/Dissolution/Consolidation | 35 |
| D. | | Provisions Governing Distribution | 3536 |
|  | 1. | Initial Distribution Date | 3536 |
|  | 2. | Disputed Claims Reserve | 3536 |
|  | 3. | Quarterly Distributions | 3637 |
|  | 4. | Record Date for Distributions | 3637 |
|  | 5. | Delivery of Distributions | 37 |
|  | 6. | Surrender of Canceled Instruments and Securities | 39 |
|  | 7. | Manner of Cash Payments Under the Plan or the Plan Administrator Agreement | 3940 |
|  | 8. | Time Bar to Cash Payments by Check | 40 |
|  | 9. | Compliance with Tax Requirements | 4041 |
|  | 10. | No Payments of Fractional Dollars | 4041 |
|  | 11. | Interest on Claims | 41 |
|  | 12. | No Distribution in Excess of Allowed Amount of Claim | 4142 |
|  | 13. | Setoff and Recoupment | 4142 |
|  | 14. | Contractual Subordination Rights | 4142 |
| E. | | Disputed Claims | 4243 |
|  | 1. | No Distribution Pending Allowance | 4243 |
|  | 2. | Resolution of Disputed Claims | 4243 |
|  | 3. | Objection Deadline | 4243 |
|  | 4. | Estimation of Claims | 4243 |
|  | 5. | Disallowance of Claims | 43 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 4344 |
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 4344 |
|  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 44 |
| G. | | Conditions Precedent to Confirmation and the Effective Date | 4445 |
|  | 1. | Conditions to Confirmation | 4445 |
|  | 2. | Conditions Precedent to the Effective Date | 4445 |
|  | 3. | Waiver of Conditions Precedent | 45 |
| H. | | Release, Injunction, and Related Provisions | 4546 |

| | | | |
|---|---|---|---|
| 1. | Compromise and Settlement | | 4546 |
| 2. | Exculpation | | 4546 |
| 3. | No Release of Co-Obligor or Joint Tortfeasor | | 4647 |
| 4. | Preservation of Rights of Action | | 47 |
| 5. | Release and Injunction | | 49 |
| 6. | Injunction Against Interference with the Plan | | 50 |
| 7. | Reservation of Litigation Rights | | 50 |
| 8. | Releases of Liens | | 5051 |
| I. | No Discharge for the Debtor | | 51 |
| J. | United States Securities and Exchange Commission | | 51 |
| K. | Retention of Jurisdiction | | 51 |
| JL. | Miscellaneous Provisions | | 53 |
| 1. | Final Fee Applications and Initial Trustee Fees | | 53 |
| 2. | Payment of Statutory Fees | | 5354 |
| 3. | Modification of Plan | | 5354 |
| 4. | Revocation of Plan | | 54 |
| 5. | Successors and Assigns | | 5455 |
| 6. | Governing Law | | 5455 |
| 7. | Reservation of Rights | | 5455 |
| 8. | Section 1146 Exemption | | 55 |
| 9. | Section 1125(e) Good Faith Compliance | | 55 |
| 9. | Directors and Officers Liability Insurance | | 56 |
| 10. | Further Assurances | | 5556 |
| 11. | Service of Documents | | 5556 |
| 12. | Filing of Additional Documents | | 5658 |
| 13. | Aid and Recognition | | 5658 |
| 14. | Document Retention | | 5758 |
| V. | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 5758 |
| A. | The Confirmation Hearing | | 5758 |
| B. | Confirmation Standards | | 5759 |
| C. | Financial Feasibility | | 5961 |
| D. | Best Interest of Creditors Test | | 6061 |
| E. | Acceptance by Impaired Classes | | 6163 |
| F. | Confirmation Without Acceptance by All Impaired Classes | | 6264 |
| 1. | No Unfair Discrimination | | 6364 |
| 2. | Fair and Equitable Test | | 6364 |
| VI. | CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING | | 6466 |
| A. | Certain Bankruptcy Law Considerations | | 6466 |
| 1. | Parties in Interest May Object to the Plan's Classification of Claims and Interests | | 6566 |
| 2. | Failure to Satisfy Vote Requirements | | 6566 |
| 3. | The Debtor May Not Be Able to Secure Confirmation of the Plan | | 6567 |
| 4. | Nonconsensual Confirmation | | 6668 |

603415

|  | 5. | The Debtor May Object to the Amount or Classification of a Claim | 67 68 |
|  | 6. | The FDIC Has Asserted a Claim under section 365(o) of the Bankruptcy Code | 67 68 |
|  | 7. | Risk of Non-Occurrence of the Effective Date | 67 69 |
|  | 8. | Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan | 67 69 |
| B. | | Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims | 68 69 |
|  | 1. | The Debtor Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes | 68 70 |
|  | 2. | The Debtor is Involved in Litigation Which, if Adversely Determined, Could Result in Substantially Less Funds Being Available for Distribution | 68 70 |
| C. | | Disclosure Statement Disclaimer | 69 70 |
|  | 1. | Information Contained Herein Is for Soliciting Votes | 69 70 |
|  | 2. | This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission | 69 70 |
|  | 3. | Reliance on Exemptions from Registration Under the Securities Act | 69 |
|  | 4. | No Legal Advice is being provided in this Disclosure Statement | 69 71 |
|  | 5. 4. | No Admissions Made | 70 71 |
|  | 6. 5. | Failure to Identify Litigation Claims or Projected Objections | 70 71 |
|  | 7. 6. | No Waiver of Right to Object or Right to Recover Transfers and Assets | 70 71 |
|  | 8. 7. | Potential Exists for Inaccuracies, and the Debtor Has No Duty to Update | 70 71 |
|  | 9. 8. | No Representations Outside this Disclosure Statement Are Authorized | 71 72 |
| D. | | Liquidation Under Chapter 7 | 71 72 |
| VII. | | CERTAIN TAX CONSEQUENCES | 71 72 |
| VIII. | | PLAN SUPPLEMENT | 72 73 |
| IX. | | CONCLUSION AND RECOMMENDATION | 73 74 |

EXHIBITS

Exhibit A — Plan

Exhibit B — Liquidation Analysis

603415

## I.   SUMMARY

The following summary of this Disclosure Statement is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.[1]

On May 14, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Puerto Rico (the "Bankruptcy Court"). Judge Enrique S. Lamoutte is presiding over the Debtor's Chapter 11 Case. The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

R&G Financial Corporation ("RGFC") was the direct parent of R-G Premier Bank of Puerto Rico (the "Bank"), a state-chartered nonmember bank, through which RGFC primarily conducted its business.

This Disclosure Statement is filed by the Debtor pursuant to section 1125 of the Bankruptcy Code and is being submitted to holders of Claims against and Interests in the Debtor in connection with the solicitation of votes to accept or reject the Plan and the hearing to consider confirmation of the Plan, which is scheduled for ~~_____~~November 29, 2011, at ~~_____~~2:00 p.m. A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

### A.   Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code. The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession. **As a result of various factors described more fully herein, the Debtor believes that the Plan is in the best**

---

[1] Capitalized terms used and not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

**interests of its creditors.** To fairly and expeditiously distribute the Debtor's assets consistent with the Bankruptcy Code, the Debtor has proposed the Plan. Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### B. The Purpose and Effect of the Plan

The Plan provides for the monetization and distribution of the assets of the Debtor for the benefit of Holders of Allowed Claims. These assets will be distributed to Holders of Allowed Claims on or after the Effective Date of the Plan. In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtor's Estate (including Causes of Action not expressly released under the Plan) shall vest in Liquidating RGFC. Liquidating RGFC shall continue in operation in order to monetize the remaining assets, continue litigation with the FDIC and potentially pursue litigation against other parties, and make distributions under the Plan. The Plan Administrator shall be appointed on the Effective Date of the Plan and shall be responsible for implementing the Plan, subject to the oversight of the Plan ~~Committee~~Consultant.

The Debtor believes that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Debtor believes that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or attempts by other parties in interest to file competing plans, would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

2

### C. Treatment of Claims and Interests Under the Plan

The Plan divides all Claims, other than Administrative Claims and Priority Tax Claims, and all Interests into various Classes. Listed below is a summary of the Classes of Claims and Interests under the Plan, including status and voting rights pursuant thereto.

#### 1. Summary of Classified Claims and Interests of RGFC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | ~~RGFC~~ Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC ~~Priority~~ Claims | Impaired | Yes |
| 4 | ~~RGFC~~ General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Notes Claims | Impaired | Yes |
| 6 | RGFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 7 | RGFC Common Stock Interests | Impaired | No (deemed to reject) |

The following table summarizes the Classes of Claims and Interests under the Plan, as well as the treatment of such Classes and projected recoveries. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern. The projected recoveries are based upon certain assumptions contained in the Liquidation Analysis prepared by the Debtor, its Professionals, and its representatives. The ranges of recoveries listed below are based on various assumptions, including assumptions regarding asset realization, the total amount of the Allowed General Unsecured Claims, Subordinated Notes Claims, FDIC ~~Priority~~ Claims, Administrative Claims, Non-FDIC Priority Claims and Priority Tax Claims, and assumptions concerning the costs to monetize the Debtor's assets and pursue certain litigation. In addition, absent a successful resolution of the FDIC ~~Priority~~ Claims that allegedly are entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, no Distributions will be made to Holders of Allowed Claims in any RGFC Classes, other than Class 1 and Class 2. The timing of any resolution of ~~the FDIC Priority Claim~~ any FDIC Claims that are allegedly entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, and any resulting Distribution thereon, cannot be estimated or predicted with any certainty. The classification, treatment and the projected recoveries of classified Claims and Interests under the Plan are described in

3

summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article III of the Plan.

**2.     Unclassified Claims**

| Claim | Plan Treatment | Range of Estimated Claims | Project Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Paid in full in Cash | $0.2 - 0.4 million | 100% |
| Priority Tax Claims | Paid in full in Cash | $0[2] | 100% |

**3.     Summary of Classification, Treatment and Projected Recoveries of Classified Claims and Interests**

| RGFC CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
| 1 | ~~RGFC~~ Secured Claims | (1) Paid in full in Cash, (2) receive collateral securing its Allowed Secured Claim, plus post-petition interest if required by section 506(c) of the Bankruptcy Code, or (3) receive other treatment rendering Secured Claim Unimpaired | $0 | 100% |
| 2 | ~~RGFC~~ Non- | Each Holder shall receive Cash equal | $0.350 to | 100% |

[2] The Puerto Rico Department of Treasury (the "PRT") ~~has~~ filed a Proof of Claim ~~that alleges~~ alleging that it ~~holds~~ held Priority Tax Claims in excess of $3.85 million. ~~The PRT's alleged Priority Tax Claim does not assert any claims for actual, unpaid tax liabilities. Rather, the PRT's claim consists entirely interest and penalties attributable to the PRT's inability to locate certain payment reconciliations that were submitted by the Debtor in connection with its transmission of prior tax payments for the tax years 1997-2010. The Debtor has submitted an objection to the PRT's Claim and vigorously disputes the merits of that Claim. The Debtor believes that a very strong argument exists that no portion of the PRT's Claim should qualify as a Priority Tax Claim.~~ However, the PRT's Proof of Claim, including its alleged Priority Tax Claims, was denied in its entirety by an order dated June 3, 2011. Consequently, the PRT's alleged $3.85 million Priority Tax Claim ~~has been excluded from~~ was not included in the analysis in the chart above.

| | | **RGFC CLAIMS AND INTERESTS** | | |
|---|---|---|---|---|
| **Class** | **Claim or Interest** | **Plan Treatment of Class** | **Range of Estimated Claims** | **Projected Recovery Under the Plan** |
| | FDIC Priority Claims | to full amount of its Allowed Claim, unless Holder agrees to less favorable treatment | $0.900 million | |
| 3 | ~~RGFC~~ FDIC ~~Priority~~ Claims | Each Holder of an Allowed FDIC ~~Priority Claim shall receive all Net Free Cash as it is available until such Allowed Claim~~ Claim shall: (i) to the extent that any portion of the Allowed FDIC Claim is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such an Allowed FDIC Claim entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code shall receive a Distribution of all Net Free Cash as such Net Free Cash is available on such distribution date until the portion of the Allowed FDIC Claim that is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code is paid in full; and (ii) with respect to any portion of the Allowed FDIC Claim that is not entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such FDIC Claim shall receive a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date. | $Unliquidated [3] | N/A |
| 4 | ~~RGFC~~ General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | $10.9 to $15.4 million | 0.30%-2.3% |

[3] The FDIC filed a Proof of Claim in the Chapter 11 Case, which alleged that the FDIC held FDIC ~~Priority~~ Claims entitled to priority under sections 507(a)(9) and/or 365(o) of the Bankruptcy Code "in an amount to be determined." The FDIC's Proof of Claim did not include any evidence or documentation to substantiate the existence of its alleged ~~FDIC Priority Claim~~ priority claim, nor has the FDIC responded to the Debtor's requests to review such information and documentation underpinning the FDIC's alleged ~~FDIC Priority Claim~~ priority claim. The Debtor believes that ultimately, ~~an FDIC Priority Claim will not be Allowed in any amount~~ no FDIC Claims alleging priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code will be Allowed.

603415

| RGFC CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
| 5 | Subordinated Notes Claims | Each Allowed Subordinated Notes Claim shall receive a Pro Rata Distribution of Residual Net Free Cash. | Approx. $385 million | 0.30%-2.3% |
| 6 | RGFC Preferred Stock Interests | ~~Deemed Cancelled~~Stock Interests in RGFC Class 6 will be cancelled and shall not receive any distribution under the Plan. | N/A | 0% |
| 7 | RGFC Common Stock Interests | ~~Deemed Cancelled~~Stock Interests in RGFC Class 7 will be cancelled and shall not receive any distribution under the Plan. | N/A | 0% |

### D.       Claims Estimates

Debtor RGFC's primary obligations are principal and interest payments on its Subordinated Notes Claims owed to the Holders of Trust Preferred Subordinated Debentures.  As of the Petition Date, RGFC's obligations with respect to Subordinated Notes Claims totaled approximately $385.0 million.  These debt obligations are all unsecured obligations of RGFC and are discussed in more detail later in this Disclosure Statement.

In addition, the FDIC has filed a Proof of Claim in the Debtor's Chapter 11 Case in an unliquidated amount, but in excess of $3.4 million. The FDIC's Proof of Claim asserts that it holds an unliquidated claim based on an alleged capital maintenance commitment made to a Federal depository institutions regulatory agency, but does not include documentation or evidence to substantiate the existence of its alleged capital maintenance claim. As discussed later in this Disclosure Statement, the Debtor vigorously disputes the validity and classification of the same.

The Puerto Rico Department of Treasury (the "PRT") filed a Proof of Claim in the Debtor's Chapter 11 Case that asserts a total claim in excess of $5.9 million, approximately $3.85 million of which

was asserted as a Priority Tax Claim under Bankruptcy Code section 507(a)(8). Notably, the PRT's Proof of Claim ~~does~~did not allege that the Debtor has any liability for any unpaid, original tax obligations. Rather, the PRT's Proof of Claim is based entirely on interest, surcharges, and penalties relating to the Debtor's alleged failure to remit certain payment reconciliations along with its tax payments for certain tax years between 1997 and 2010. ~~Prior to filing its Proof of Claim, the PRT had never alleged that the Debtor had failed to submit any such reconciliations, some of which were submitted to the PRT almost a decade ago. The Debtor vigorously disputes the merits of the PRT's Proof of Claim, and has filed an objection to the same. The Debtor believes that there is a very strong argument that the PRT's Proof of Claim should be disallowed in its entirety.~~The PRT's Proof of Claim was denied in its entirety by a Bankruptcy Court order dated June 3, 2011.

Various other Claims have been filed in the Debtor's Chapter 11 Case; however, the Claims discussed above constitute the most significant in amount of Claims.

### E.    Transactions Contemplated by the Plan

On the Effective Date, all of the Debtor's assets shall be transferred to, and vest in, Liquidating RGFC. The Plan provides for the appointment of ~~_____~~Clifford Zucker, CPA as the Plan Administrator and ~~_____~~Wilmington Trust Company as the ~~members of the~~ Plan ~~Committee~~Consultant to oversee the activities of Liquidating RGFC.

The Plan Administrator, supervised by the Plan ~~Committee~~Consultant, shall be responsible for administering Liquidating RGFC as set forth under the Plan and the Plan Administrator Agreement, including monetizing all of Liquidating RGFC's assets, resolving all Claims, pursuing all Causes of Action and distributing Net Free Cash and Residual Net Free Cash.

### F.    Consummation

Following confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to the occurrence of the Effective Date have been satisfied or waived. Distributions

to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

### G.     Liquidation Analysis

The Debtor believes that the Plan will produce a recovery for Holders of Allowed Claims against the Estate that is no less than what would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code. In fact, the Debtor believes recoveries under the Plan for Holders of Allowed Claims will likely be more than in a chapter 7 liquidation because of, among other things, (1) the additional Administrative Claims generated by conversion to a chapter 7 case and (2) the administrative costs of liquidation and associated delays in connection with chapter 7 liquidation.

The Debtor, together with its Professionals and Representatives, has prepared a Liquidation Analysis, a copy of which is attached to this Disclosure Statement as Exhibit B, to assist Holders of Claims in determining whether to vote to accept or reject the Plan. The Liquidation Analysis compares the proceeds to be realized if the Debtor were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the Distributions to Holders of Allowed Claims and Interests under the Plan. The analysis is based upon the value of the Debtor's assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to the possibility of material change, including changes with respect to economic and business conditions and legal rulings. **Therefore, the actual liquidation value of the Debtor could vary materially from the estimates provided in the Liquidation Analysis.**

### H.     Risk Factors

Prior to voting to accept or reject the Plan, each Holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article VI.

### I.     Voting and Confirmation

Holders of Claims in Classes 1 and 2 for RGFC are Unimpaired and are conclusively presumed to accept the Plan and therefore the vote of such Holders of Claims shall not be solicited. Holders of Interests

in Classes 6 and 7 for RGFC are wholly Impaired and are also conclusively presumed to reject the Plan. Accordingly, Holders of Interests in Classes 6 and 7 for RGFC are not entitled to vote on the Plan, and the vote of such Holders of Interests shall not be solicited. Only Holders of Claims in Classes 3, 4, and 5 for RGFC are entitled to vote to either accept or reject the Plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan. The Debtor will tabulate all votes on the Plan for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

Assuming the requisite acceptances are obtained, the Debtor intends to seek confirmation of the Plan at the confirmation hearing scheduled to commence on [DATE], November 29, 2011, at [TIME] [ ]2:00 p.m., prevailing Eastern Atlantic time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtor shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtor also reserves the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established [DATE], September 26, 2011, as the voting record date for determining which Holders of Claims are eligible to vote to accept or reject the Plan. Ballots, along with this Disclosure Statement, the Plan, and the Disclosure Statement Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the voting record date that are entitled to vote to accept or reject the Plan.

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE**

BALLOTS INDICATE THAT THE BALLOT MUST BE RETURNED TO THE VOTING AGENT. THE ADDRESS FOR BALLOTS RETURNABLE TO THE VOTING AGENT IS: ~~PATTON BOGGS LLP,~~KURTZMAN CARSON CONSULTANTS LLC, 599 LEXINGTON AVENUE, 39TH FLOOR, NEW YORK, NY 10022, ATTN: R&G FINANCIAL ~~CORP, 2000 MCKINNEY AVENUE, SUITE 1700, DALLAS, TEXAS 75201,~~BALLOT TABULATION. FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE VOTING AGENT AT ~~(214) 758-1500~~888-249-2741. TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE ~~DISCLOSURE STATEMENT~~SOLICITATION PROCEDURES ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE DEBTOR.

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other solicitation package materials, please request a copy from ~~Patton Boggs LLP (including ballots), either~~Kurtzman Carson Consultants LLC by calling ~~(214) 758-1500~~888) 249-2741, or by writing to ~~Patton Boggs LLP,~~Kurtzman Carson Consultants LLC, 599 Lexington Ave, 39th Floor, New York, NY 10022, Attn: R&G Financial Corporation~~, 2000 McKinney Avenue, Suite 1700, Dallas, Texas 75201~~. Copies of the Plan and Disclosure Statement are also available by visiting www.pattonboggs.com/newsletters/rgfc.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF GENERAL UNSECURED CREDITORS AND RECOMMENDS THAT SUCH CREDITORS VOTE TO <u>ACCEPT</u> THE PLAN.

## II.    BACKGROUND TO THE CHAPTER 11 CASE

The following is a general summary of the Debtor's businesses prior to the filing of its Chapter 11 Case.

### A.    The Debtor's Business

The Debtor was a financial holding company organized as a Puerto Rico Corporation. Prior to the Bank's closure, the Debtor conducted its principal operations through the Bank. The Bank was wholly-owned by, and was the primary asset of, RGFC. As a state-chartered nonmember bank, the Bank was subject to regulation and examination by the Federal Deposit Insurance Corporation (the "FDIC"), its primary federal regulator, and was also subject to regulation by the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico (the "OCFI"). As a bank holding company, RGFC was also subject to regulation and examination by the Board of Governors of the Federal Reserve (the "FED"). The Bank was one of ten banks operating in Puerto Rico before it was closed by the OCFI on April 30, 2010.

Prior to its bankruptcy filing, the Debtor conducted operations for more than thirty years, and provided a wide range of banking services through its subsidiaries. These subsidiaries included the Bank, which held many branches throughout Puerto Rico, as well as the Debtor's former banking subsidiary, Crown Bank, which held numerous branches in the state of Florida. The Debtor's interest in Crown Bank was sold to a subsidiary of Fifth Third Bancorp in November 2007. Banking services offered through these subsidiaries included commercial banking services, corporate real estate and business lending, residential construction lending, consumer lending, and credit cards.

In addition to these banking services the Debtor, at other times before its bankruptcy filing, provided other financially-related services through various other subsidiaries, including investment services, private banking, and real estate secured lending activities, including the origination, servicing, purchase and sale of mortgages on single-family residences, the securitization and sale of various mortgage-backed and related securities, the holding and financing of mortgage loans and mortgage-backed

and related securities for sale or investment, and the purchase and sale of servicing rights associated with such mortgage loans.

The lending activities of the Debtor's subsidiaries focused primarily on lending to residential properties, but were not limited solely to such loans. In addition to residential real estate loans, the loan portfolios of the Debtor and its subsidiaries included a diverse mix of other types of loans, including commercial real estate loans (CRE), acquisition development and construction loans (ADC), and commercial and industrial loans.

The effects of the global economic slowdown and "great recession" had a significant impact on the Debtor's financial condition and resulted in a significant reduction in the value of these loan portfolios. The resulting erosion of the value of the Bank's loan portfolio and capital position ultimately led to intervention by applicable banking regulators. On March 14, 2006, the Bank and the Debtor consented to the issuance of Cease and Desist orders by, respectively, the FDIC (the "2006 FDIC C&D Order") and the FED (the "2006 FED C&D Order," and collectively, with the 2006 FDIC C&D Order, the "2006 C&D Orders"). On that same date, the OCFI and the Bank also agreed that the issuance of the FDIC's March 14, 2006 C&D Order would be binding upon the OCFI and the Bank with the same legal effect as if the OCFI had issued a separate order.

The 2006 C&D Orders required the Debtor and the Bank to, among other things, file with the Fed and the FDIC within proscribed time periods updated plans to address the Bank's capital and liquidity, to engage a public consultant to report on specified matters relating to the mortgage loans in the loan portfolio, and to act on recommendations resulting therefrom. The Debtor and the Bank worked diligently to comply with the provisions of the 2006 C&D Orders and take appropriate measures to enhance the Bank's capital and liquidity positions. However, in the wake of the economic difficulties associated with the global economic slowdown that began shortly after entry of the 2006 C&D Orders, enhancing the Bank's capital position proved to be a challenging task.

On October 23, 2009, the board of directors of the Bank entered into a stipulation and consent to the issuance of an Amended Order to Cease and Desist with the FDIC (the "2009 FDIC C&D Order"), which amended and restated the 2006 FDIC C&D Order. Again, the OCFI and the Bank also agreed that the 2009 FDIC C&D Order would be binding upon the OCFI and the Bank as if the OCFI had issued a separate order. Pursuant to the terms of the 2009 C&D Order, the Bank was required to, among other things: (i) take affirmative actions that included engaging an independent consultant to analyze the Bank's management performance and staffing needs; (ii) submit various plans to address issues addressed in the 2009 FDIC C&D Order; (iii) maintain certain Tier 1 leverage ratios and risk based capital ratios, and (iv) review and adjust, as necessary, the Bank's allowances for loan losses and current level of past due and nonperforming loans.

Again, prior to, and following the entry of the 2009 FDIC C&D Order, the Debtor and the Bank worked to address all issues raised in the 2009 FDIC C&D Order and take steps to improve the Bank's profitability, capital levels, and liquidity. However, notwithstanding these efforts, the financial positions of the Debtor and the Bank continued to deteriorate. Consequently, on April 30, 2010, the OCFI closed the Bank and appointed the FDIC as receiver for the Bank. On that same day, the FDIC also entered into a Purchase and Assumption Agreement with Scotiabank de Puerto Rico ("Scotiabank"), whereby Scotiabank purchased substantially all of the Bank's assets and assumed certain of the Bank's liabilities, including liabilities for the Bank's deposits.

In the wake of the loss of its principal operating subsidiary, the Debtor ~~similarly~~ filed a voluntary chapter 11 petition on May 14, 2010.

## B. Debt Structure

### 1. FirstBank Secured Indebtedness

In February of 2004, R&G International Corporation, which as of the Petition Date was a division of RGFC, entered into a credit agreement with FirstBank International Branch, a division of FirstBank Puerto Rico ("FirstBank"). The terms of RGFC's Credit Agreement with FirstBank were amended and

restated in February, 2008 and memorialized in an Amended and Restated Credit Agreement (the "FirstBank Credit Agreement"). Pursuant to the FirstBank Credit Agreement, FirstBank Agreed to extend credit to RGFC, which would be secured by RGFC's interest in certain commercial real estate loan participations. As of the Petition Date, RGFC's outstanding obligations to FirstBank under the FirstBank Credit Agreement totaled approximately $32.5 million. FirstBank's pre-petition claims against the Debtor were satisfied pursuant to the FirstBank Settlement. As described in greater detail in Article III herein, pursuant to the FirstBank Settlement, FirstBank has waived all of its pre-petition claims against RGFC, and will not be entitled to receive any further distributions from RGFC under its Plan. Because FirstBank has withdrawn and waived its pre-petition claims in accordance with the FirstBank Settlement, and no longer holds a valid pre-petition claim against RGFC, FirstBank's pre-petition claim is not classified or treated under the Debtor's Plan.

### 2. Trust Preferred Subordinated Debentures

RGFC owns all of the common stock of various trusts. Trust Preferred Securities, issued by these trusts, are held by investors. Each of the trusts was formed for the purpose of issuing trust preferred securities and investing the proceeds from the sale thereof solely in junior subordinated debentures issued by RGFC, which in turn used the proceeds of the debentures for investment in the Bank or other corporate purposes. From 2003 through 2004, RGFC issued trust preferred securities through its trust subsidiaries. At the time of its bankruptcy filing, RGFC had obligations of approximately $385 million pertaining to outstanding subordinated debentures related to three trusts (the "Trust Preferred Subordinated Debentures"). These Trust Preferred Subordinated Debentures, by their terms, were junior in payment to RGFC's obligations to FirstBank under the FirstBank Credit Agreement. However, pursuant to the FirstBank Settlement, FirstBank waived any subordination rights provided in the Trust Preferred Subordinated Debentures. Following the execution of the FirstBank Settlement, the Debtor is not aware of any other outstanding indebtedness which would be senior to the Trust Preferred Subordinated Debentures. The Debtor believes that the all of its Trust Preferred Subordinated Debenture obligations are pari passu in

payment with all other RGFC General Unsecured Claims. Wilmington Trust is the Indenture Trustee for the three outstanding Trust Preferred Subordinated Debentures.

### C. Stock

RGFC has four outstanding classes of preferred stock outstanding. On the Petition Date, RGFC had the following amounts of preferred stock authorized, issued, and outstanding: (i) 2,000,000 shares of RGFC Series A 7.40% Preferred Stock Interests; (ii) 1,000,000 shares of RGFC Series B 7.75% Preferred Stock Interests; (iii) 2,760,000 shares of RGFC Series C 7.60% Preferred Stock Interests; and (iv) 2,760,000 shares of RGFC Series D 7.25% Preferred Stock Interests. All RGFC preferred shares represent non-cumulative, perpetual shares of preferred stock, with a $25 liquidation value.

RGFC also has two outstanding classes of common stock outstanding. RGFC had 80,000,000 authorized shares of RGFC Class A Common Stock Interests, of which 21,559,584 shares were issued and outstanding on the Petition Date. These RGFC Class A Common Stock Interests have a par value of 0.01 per share and have been owned by Victor J. Galán, one of the Debtor's directors, since RGFC's founding. Additionally, RGFC also had 120,000,000 authorized shares of RGFC Class B Common Stock Interests, of which 29,625,180 shares were issued and outstanding on the Petition Date. These RGFC Class B Common Stock Interests have a par value of $0.01 per share.

Prior to the Petition Date, RGFC's Class B Common Stock was publicly traded on the New York Stock Exchange under the symbol "RGF". RGFC was delisted from the New York Stock Exchange in 2007.

## III. THE CHAPTER 11 CASE

The following is a general summary of some of the key matters and occurrences in connection with the Debtor's Chapter 11 Case.

### A. General Case Administration Matters

As previously noted, the Debtor filed its Chapter 11 petition on May 14, 2010. Prior to the Petition Date, all of the Debtor's officers and employees either resigned or were terminated from the

Debtor's employ. In the wake of these resignations and terminations, Juan Agosto Alicea, chairman of the Debtor's Board of Directors, was appointed as the Debtor's sole officer. In order to continue the Debtor's operations and preserve its remaining assets, the Debtor retained the services of three contract managers, Rolando Rodriguez Mancebo, Maria Cristina Mena, and José Luis Ortiz (collectively, the "Contract Managers"). In an order dated July 14, 2010, the Contract Managers were formally approved as the Debtor's representatives pursuant to Local Bankruptcy Rule 4002-1, and authorized to take any and all actions, on behalf of the Debtor, that the Debtor was required to perform during its bankruptcy case. Since their appointment as representatives, the Contract Managers have continued to assist the Debtor in facilitating an orderly wind-down of the Debtor's operations.

To assist the Debtor in carrying out its duties as a debtor-in-possession and to otherwise represent the Debtor's interests in the Chapter 11 Case, the Bankruptcy Court approved the employment of Patton Boggs LLP ("Patton Boggs") and Pietrantoni Mendez & Alvarez LLP ("PMA") as the Debtor's general bankruptcy counsel. The Bankruptcy Court also approved the Debtor's retention of Carlos M. Machado, P.A., of Sanchez-Medina, Gonzalez, Quesada, Lage, Crespo, Gomez & Machado LLP ("Machado") as special counsel to the Debtor, to assist the Debtor in evaluating and protecting its interests in certain commercial real estate loan participations, which were secured by commercial real estate located in the State of Florida. Finally, Zaragoza & Alvarado LLP ("Zaragoza") was retained to provide the Debtor with certain accounting and taxation services.

The Debtor filed its schedules, statement of financial affairs, and list of equity security holders with the Bankruptcy Court on June 21, 2010. The Debtor's Schedules were subsequently amended on September 10, 2010 and February 14, 2011. The first meeting of creditors of the Debtor pursuant to section 341 of the Bankruptcy Code was held on July 7, 2010.

A Bar Date for all non-governmental claimants for which the deadline to file a proof of claim or interest was not extended by operation of the Bankruptcy Rules, was September 21, 2010. The Bar Date for all governmental claimants was November 17, 2010.

Debtor RGFC's primary assets now consist of approximately $2.2 million in cash, as well as potential litigation claims and investments in non-debtor subsidiaries, including RGFC's 100% ownership interest in non-debtor R&G Acquisition Holdings Corp. ("RAC"). RAC's principal asset is approximately $4.6 million of cash. RAC is currently participating in a pending administrative appeal before the Internal Revenue Service (the "IRS") regarding its tax liability for the tax years 2006 and 2007, in which the IRS is seeking taxes, interest, and penalties of no less than $4.9 million. The Debtor believes that the IRS' alleged claims against RAC for taxes, interest, and penalties are unfounded. However, until RAC's pending administrative proceeding is finally and conclusively resolved, it is uncertain what value (if any) may ultimately be realized from its interest in RAC.

The Debtor's assets also include certain directors and officers liability insurance policies which provide up to $35 million in coverage for acts occurring prior to December 30, 2010 (collectively, the "D&O Policies").

### B.    FirstBank Settlement Agreement

Since the inception of its bankruptcy case, the Debtor has engaged in negotiations with its only pre-petition secured lender, FirstBank, regarding the potential satisfaction of FirstBank's pre-petition claim. On the Petition Date, FirstBank held a pre-petition claim in excess of $32 million, which related to the FirstBank Credit Agreement. The Debtor's obligations under the FirstBank Credit Agreement were secured by participations in loans secured by commercial real property in the State of Florida (the "Loan Participations"). As a result of the global economic slowdown of 2008 and concurrent weakness in the Florida real estate markets, the value of the Loan Participations on the Petition Date was significantly less than the amount of FirstBank's pre-petition claim.

Because FirstBank's collateral did not exceed the value of its pre-petition claim, FirstBank would have held a substantial unsecured claim against the Debtor's estate for the remaining loan balance above and beyond FirstBank's collateral value. The Debtor believed that this deficiency claim would have been

603415

large enough to provide FirstBank with a distribution of more than $3.0 million under its chapter 11 plan with respect to its unsecured "deficiency claim."

Ultimately, the Debtor and FirstBank were able to negotiate a global resolution of all of FirstBank's secured and unsecured claims against the Debtor. This agreement was memorialized in the FirstBank Settlement. Under the FirstBank Settlement, FirstBank agreed to accept the following consideration in full satisfaction of all of its pre-petition claims against the Debtor, whether secured, unsecured, or otherwise:

    a.    FirstBank would receive a direct assignment of all outstanding Loan Participations securing the Debtor's obligations to FirstBank under the Credit Agreement;

    b.    The Debtor would consent to the Bankruptcy Court's distribution to FirstBank of cash proceeds from the Loan Participations on deposit into the Court's registry;

    c.    FirstBank would receive a one time cash payment of three million dollars ($3,000,000);

    d.    FirstBank would release its interest in any Loan Participation proceeds that were subject to alleged offset claims by Fifth Third Bank, administrative agent for the Loan Participations, which remained in Fifth Third's possession pending resolution of such alleged offset claims;

    e.    FirstBank would waive its right to receive distributions from the Debtor's estate before payment was made on any of the Debtor's Trust Preferred Subordinated Debentures, which were structurally subordinate to FirstBank before execution of the FirstBank Settlement; and

    f.    FirstBank would release the Debtor from any and all claims that FirstBank may have against the Debtor accruing before the execution of the FirstBank Settlement.

The Debtor believed that the FirstBank Settlement was in the best interest of its estate, as the FirstBank Settlement would permit satisfaction of FirstBank's unsecured claim with distributions in an amount less than the distributions that FirstBank was expected to receive under the Debtor's Plan, which would increase the potential pool of assets available for distribution to the Debtor's other creditors. Indeed, no party submitted any objection to the Debtor's proposed settlement with FirstBank after it was proposed in a motion filed on April 1, 2011.

The FirstBank ~~settlement~~Settlement was approved by an order of the Bankruptcy Court dated April 26, 2011. Since its approval on April 26, 2011, the Debtor and FirstBank have fully executed the provisions of the FirstBank Settlement, and all of FirstBank's pre-petition claims have been satisfied in full. Because FirstBank's pre-petition claims were fully satisfied through the FirstBank Settlement, FirstBank is not entitled to receive any distributions under the Plan and FirstBank's Claim has not been placed in any Plan Class.

### C. Motion to Extend the Automatic Stay

Prior to August 2007, the Debtor was the sole shareholder of R&G Investments Corporation ("RGIC"). In August 2007, RGIC was formally dissolved, distributed substantially all of its assets to the Debtor and obtained formal certification from the Puerto Rico Department of State documenting its dissolution. In connection with the agreement to dissolve RGIC, the Debtor agreed to assume all contingent litigation liabilities associated with claims by RGIC's former customers.

Notwithstanding RGIC's dissolution in 2007, three of RGIC's former customers instituted arbitration proceedings against RGIC and the Debtor relating to their prior dealings with RGIC. Counsel for the Debtor filed an informative motion in the arbitration proceeding, which indicated that RGIC was a former subsidiary of the Debtor that had ceased operations and requested that the arbitrator stay the arbitration as to the Debtor and RGIC.

The arbitrator initially informed the Debtor that the arbitration would be stayed as to the Debtor and RGIC, but later indicated that the arbitration would be stayed with respect to the Debtor, but not RGIC. Because any action nominally against RGIC would effectively constitute an action against the Debtor, in potential violation of the automatic stay, the Debtor filed a motion in the Bankruptcy Court requesting a determination as to whether permitting the arbitration matters to proceed against RGIC would constitute a violation of the automatic stay. The Bankruptcy Court entered an interim order on June 11, 2010, which temporarily stayed the arbitration against RGIC, pending the results of subsequent briefing by

the parties. Following briefing by both the Debtor and the arbitration claimants, the Bankruptcy Court issued a final order on November 18, 2010, which held that the automatic stay did prohibit the continuation of an arbitration proceeding against RGIC, and extended the provisions of the automatic stay to the arbitration action. The RGIC arbitration proceeding remains stayed pursuant to the Court's final order.

### D. Wilmington Trust Company's Derivative Standing Investigation

Due to the closure of the Bank and the Debtor's bankruptcy filing, the Debtor's largest unsecured creditor, Wilmington Trust (in its capacity as trustee for the Trust Preferred Subordinated Debentures) believed that the Debtor's estate may hold claims against the Debtor's current and former officers and directors. Wilmington Trust believed that these potential claims included, without limitation, claims arising from breaches of duties owed by the officers and directors to the Debtor, misrepresentation, failures to disclose, and other wrongful acts (the "WTC Claims").

Wilmington Trust alleged that because the Debtor continued to be influenced by its former officers and directors, who may have engaged in the acts or omissions giving rise to the WTC Claims, a potential conflict of interest may arise that would prohibit the Debtor from making a thorough investigation of the WTC Claims. Due to this alleged conflict, Wilmington Trust filed a motion (the "Derivative Standing Motion") requesting that, as the representative for the Debtor's largest single group of unsecured creditors, Wilmington Trust receive derivative standing to investigate, assert, and pursue certain D&O Claims on behalf of the Debtor's estate and its creditors. Wilmington Trust also requested that it receive authorization to hold, assert, and if necessary, waive the attorney-client privilege and work product privilege solely for the benefit of, and on behalf of the Debtor's estate as it investigated, asserted, and pursued the WTC Claims.

Wilmington Trust's Derivative Standing Motion drew objections from both the Debtor and the FDIC. Ultimately, the Bankruptcy Court entered an order on November 5, 2010 (the "Derivative Standing Order"), which provided Wilmington Trust with a narrowly tailored grant of derivative standing to pursue certain claims on behalf of the Debtor's estate. Pursuant to the Derivative Standing Order, Wilmington

Trust was provided with derivative standing to investigate all of the Debtor's potential claims against its current and former directors and officers, to the extent that such claims could be covered by the Debtor's D&O Policies, and for which coverage under such policies could otherwise be lost if not timely asserted (the "D&O Claims"). The Derivative Standing Order did not permit Wilmington Trust to investigate any claims other than the D&O Claims without obtaining additional Bankruptcy Court authorization.

Following entry of the Derivative Standing Order, WTC began its investigation of potential D&O Claims and requested a number of documents from the Debtor, including certain regulatory examination reports prepared by governmental authorities. Many of these regulatory examination reports were subject to federal regulations that prohibited their disclosure to the public without first obtaining either the approval of the corresponding regulatory agency or a court order authorizing their disclosure. Due to the potential conflict between the terms of the Derivative Standing Order and these regulations prohibiting the disclosure of certain sensitive regulatory materials, the Debtor filed an emergency motion with the Bankruptcy Court to obtain clarification regarding whether the Derivative Standing Order permitted the Debtor to disclose regulatory materials to Wilmington Trust, who "stood in the shoes" of the Debtor while investigating D&O Claims on behalf of the Debtor's estate. On November 18, 2010, the Bankruptcy Court issued an order (the "Clarification Order") clarifying the Derivative Standing Order, which provided that the Debtor was authorized to disclose such sensitive regulatory materials to Wilmington Trust, as part of its investigation of D&O Claims.

Since the issuance of the Derivative Standing Order and Clarification Order, Wilmington Trust has diligently pursued an investigation of the D&O Claims. On December 27, 2010, Wilmington Trust sent letters to certain current and former directors and officers of the Debtor and the Bank (the "WTC Demand Letters"), which alleged "breach of … fiduciary duties of care and loyalty to [the Debtor] and failure to perform … duties to [the Debtor] in good faith," and seeking civil damages in the amount of $335 million.

Pursuant to the terms of the Derivative Standing Order, upon the appointment of the Plan Administrator that will oversee administration of the Debtor's Plan, the Plan Administrator will succeed to

Wilmington Trust's standing to pursue to the D&O Claims for the benefit of the Debtor's Estate and Liquidating RGFC.

### E. Motion for Relief from Stay by the Debtor's Officers and Directors

The D&O Policies provided that the Debtor's insurance company would provide coverage for reasonable legal fees and expenses incurred in the defense of any of the Debtor's directors, officers, and/or employees covered by the D&O Policies while defending themselves against various asserted claims. Although the D&O Policies were owned by the Debtor, those policies either (i) provided insurance coverage only to the directors and officers themselves, or (ii) provided insurance coverage to both the Debtor and its officers and directors, but contained a "priority of payment" provision that required that subordinated the Debtor's rights to receive payment under that policy to the rights of its officers and directors.

In December of 2010, both the FDIC and Wilmington Trust, (pursuant to its powers under the Derivative Standing Order) sent demand letters to many of the Debtor's former officers and directors, which alleged that the officers and directors had committed acts, omissions, and/or breaches of fiduciary duty, which caused the Bank to suffer significant losses. The allegations in these demand letters constituted a "claim" for purposes of the D&O Policies, which entitled the Debtor's directors and officers to payment of defense costs under the D&O Policies.

The D&O Policies constituted assets of the Debtor's estate, which certain parties asserted were protected by an automatic stay imposed by the Bankruptcy Code. Consequently, ~~in order to obtain formal court authorization for the payment of defense costs pursuant to the D&O Policies~~ for the avoidance of doubt and at the request of the insurer, the Debtor's directors and officers filed a motion for relief from stay on January 26, 2011 in order to obtain formal court authorization (to the extent required) for the payment of defense costs pursuant to the D&O Policies (the "D&O Lift Stay Motion"). The Bankruptcy Court entered an order (the "D&O Lift Stay Order") on March 25, 2011 granting the relief sought in the D&O Lift Stay Motion, subject to certain modifications. Under the D&O Lift Stay Order, the Debtor's officers

603415

and directors are permitted to obtain payment of defense costs from the Insurance Policy, but must provide full disclosure to the court every three (3) months or when defense costs reach $250,000, whichever comes first. The D&O Lift Stay Order did not provide any cap on the payment of funds, but did require the disclosures set forth above.

### F. Litigation with the FDIC

The Debtor has filed a complaint in the District Court against the FDIC (the "Receivership Claim Litigation"). In this complaint, the Debtor is seeking, among other things, a determination that the Debtor's proof of claim filed in the FDIC's pending receivership of the Bank is valid and proven claim that should be allowed by law. The Debtor initiated the Receivership Claim after its proof of claim in the FDIC's pending receivership action over the Bank, which sought compensation from the FDIC in an amount not less than $1,992,153.59, was allowed in part, and disallowed in part, without any distribution to the Debtor.

The Receivership Claim Litigation is pending in the District Court and the outcome of that case is uncertain. The Debtor believes that its claims asserted in the FDIC Receivership, if allowed, would likely be beneficial to the Debtor by providing an offset against any Allowed Claims of the FDIC in the Chapter 11 Case. However, an affirmative recovery by the Debtor on such claims from the FDIC Receivership estate is unlikely because of the statutory treatment of such claims, which are subordinated to the claims of depositors of the failed Bank of the FDIC, in its corporate capacity as subrogee for such claims.

### G. Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the date on which the debtor filed for voluntary relief to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan. However, a court may extend these periods upon request of a party in interest and "for cause." The Debtor filed several motions to extend

exclusivity in the Chapter 11 Case, which the Bankruptcy Court approved.  The Debtor proposed its Plan on or before the May 31, 2011 expiration of its extended plan exclusivity period.  The Debtor presently has the exclusive right to solicit acceptances for its Plan through ~~July~~October 31, 2011, which period ~~may be extended or reduced by the Bankruptcy Court "for cause."~~ is subject to future extensions upon request by the Debtor.

## IV.   SUMMARY OF THE PLAN

### A.   Administrative and Priority Tax Claims

#### 1.   Administrative Claims

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtor, Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such later time as may be agreed upon by such Holder and Liquidating RGFC or the Plan Administrator, as applicable; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  The Plan establishes an Administrative Claim Bar Date that is the first Business Day thirty days after the Effective Date as the deadline for a Holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim. The Plan defines Effective Date as meaning the first Business Day after the Bankruptcy Court enters an order confirming the Plan (the "Confirmation Order") on which: (a) no stay of such Confirmation Order is in effect, and (b) all of the conditions precedent set forth in Article VIII.B of the Plan have either been satisfied or waived.

### 2. Priority Tax Claims

The Plan further provides that Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the latest of (i) the Effective Date; (ii) the date such Allowed Priority Tax Claim becomes Allowed; and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

### B. Classification and Treatment of Claims and Interests

### 1. Summary

The Plan constitutes a chapter 11 plan for the Debtor. Except for Administrative Claims and Priority Tax Claims, all of the Claims against and Interests the Debtor are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims.

The chart shown below classifies Claims against and Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date of the Plan.

### 2. Summary of Classified Claims and Interests of RGFC

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | ~~RGFC~~ Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC ~~Priority~~ Claims | Impaired | Yes |
| 4 | ~~RGFC~~ General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Notes Claims | Impaired | Yes |

25

| 6 | RGFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 7 | RGFC Common Stock Interests | Impaired | No (deemed to reject) |

**3.      Classification and Treatment of Claims and Interests of RGFC**

Class 1 — ~~RGFC~~ Secured Claims

(a)      Classification: Class 1 consists of all ~~RGFC~~ Secured Claims.

(b)      Impairment and Voting: Class 1 is Unimpaired by the Plan. Each Holder of a ~~RGFC~~ Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)      Treatment: Except to the extent that a Holder of a ~~RGFC~~ Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each ~~RGFC~~ Secured Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, each Holder of an Allowed ~~RGFC~~ Secured Claim shall, at the sole option of RGFC, Liquidating RGFC or the Plan Administrator, as applicable: (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed ~~RGFC~~ Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such ~~RGFC~~ Secured Claim Unimpaired, in each case on the later of the Effective Date and the date such ~~RGFC~~ Secured Claim becomes an Allowed ~~RGFC~~ Secured Claim, or as soon as practicable thereafter.

Class 2 — ~~RGFC~~ Non-FDIC Priority Claims

(a)      Classification: Class 2 consists of all ~~RGFC~~ Non-FDIC Priority Claims.

(b)      Impairment and Voting: Class 2 is Unimpaired by the Plan. Each Holder of a ~~RGFC~~ Non-FDIC Priority Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)      Treatment: On or as soon as practicable after the Effective Date, Liquidating RGFC or the Plan Administrator, as applicable, shall pay each Holder of an Allowed ~~RGFC~~ Non-FDIC Priority Claim, in full and final satisfaction of such Allowed ~~RGFC~~ Non-FDIC Priority Claim, ~~Cash~~ against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment, on or as soon as

practicable after the latest of (i) the Effective Date; (ii) the date such Allowed ~~RGFC~~ Non-FDIC Priority Claim becomes Allowed; and (iii) the date such Allowed ~~RGFC~~ Non-FDIC Priority Claim is payable under applicable non-bankruptcy law.

Class 3 — ~~RGFC~~ FDIC ~~Priority~~ Claims

(a)     Classification: Class 3 consists of all ~~RGFC~~ FDIC ~~Priority~~ Claims.

(b)     Impairment and Voting: Class 3 is Impaired by the Plan. Each Holder of a Claim that, if Allowed, would constitute a ~~RGFC~~ FDIC ~~Priority~~ Claim, is entitled to vote to accept or reject the Plan.

(c)     Treatment: In full satisfaction, settlement, release and compromise of and in exchange for each ~~RGFC~~ FDIC ~~Priority~~ Claim against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall ~~pay~~ make the following distributions to each Holder of an Allowed ~~RGFC~~ FDIC ~~Priority~~ Claim on the Initial Distribution Date, and each Quarterly Distribution Date thereafter: (i) to the extent that any portion of the Allowed FDIC Claims is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such an Allowed FDIC Claim entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code shall receive a Distribution of all Net Free Cash[4] as such Net Free Cash is available on such distribution date until the portion of the Allowed ~~RGFC FDIC Priority Claim is paid in full. The Plan states that the Initial Distribution Date shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date. In accordance with the Plan, the~~ FDIC Claim that is entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code is paid in full; and (ii) with respect to any portion of the Allowed FDIC Claims that is not entitled to priority under sections 507(a)(9) or 365(o) of the Bankruptcy Code, the Holder of such FDIC Claims shall receive a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.  The Distribution available to holders of Allowed ~~RGFC~~ FDIC ~~Priority~~ Claims shall be limited by the value of

---

[4] ~~Net Free Cash is the amount of Cash after full payment or satisfaction of, or appropriate reserve for Allowed Secured, Administrative, Priority Tax, and Non-FDIC Priority Claims; the costs of administering and implementing the Plan; and ordinary business expenses of the Plan Administrator and the Wind Down.~~

603415

RGFC's Assets after satisfaction of any Allowed ~~RGFC~~ Secured Claims and any Allowed ~~RGFC~~ Non-FDIC Priority Claims.

Class 4 — ~~RGFC~~ General Unsecured Claims

(a)     Classification: Class 4 consists of all ~~RGFC~~ General Unsecured Claims, which means a General Unsecured Claim against RGFC that is not a Subordinated Notes Claim.

(b)     Impairment and Voting: Class 4 is Impaired by the Plan. Each Holder of a Claim that, if Allowed, would constitute a ~~RGFC~~ General Unsecured Claim, is entitled to vote to accept or reject the Plan.

(c)     Treatment: In full satisfaction, settlement, release, and compromise of and in exchange for each ~~RGFC~~ General Unsecured Claim, against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall distribute to each Holder of an Allowed ~~RGFC~~General Unsecured Claim ~~shall receive~~ on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.

Class 5 — Subordinated Notes Claims

(a)     Classification: Class 5 consists of all Subordinated Notes Claims, which means General Unsecured Claims arising from or relating to the Trust Preferred Subordinated Debentures.

(b)     Impairment and Voting: Class 5 is Impaired by the Plan. Each holder of a Claim that, if Allowed, would constitute a Subordinated Notes Claim in Class 5 is entitled to vote to accept or reject the Plan.

(c)     Allowance: The Subordinated Notes Claims shall be Allowed in the aggregate amount of $384,996,233.92, which is comprised of (a) $119,069,266.26 on account of the R&G Capital Trust III Debentures; (b) $118,053,644.37 on account of the R&G Capital Trust V Debentures; and (c) $147,873,323.29 on account of the R&G Capital Trust VI Debentures. In accordance with the Plan, and except as provided in Article V.N of the Plan which deals with contractual subordination rights the

Allowed Subordinated Notes Claims shall not be subject to any reductions, setoff, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation, *provided, however,* that nothing set forth in the Plan is intended to waive, release or otherwise compromise avoidance actions, if any, arising under chapter 5 of the Bankruptcy Code, or objections, if any, to Subordinated Notes Claims pursuant to section 502(d) of the Bankruptcy Code.

(d)     Treatment: In full satisfaction, settlement, release, and compromise of and in exchange for each Subordinated Notes Claim, against the Debtor's Estate and/or any assets or properties of the Debtor's Estate or Liquidating RGFC, Liquidating RGFC or the Plan Administrator, as applicable, shall distribute to each Holder of an Allowed Subordinated Notes Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date, provided, however, that any Distribution to Holders of Allowed Subordinated Notes Claims of Residual Net Free Cash shall be redistributed by RGFC or the Plan Administrator, subject to Bankruptcy Rule 3021 and subject to any lien or priority rights of the Subordinated Indenture Trustees, pursuant to the subordination provisions of the relevant Indentures, as modified by the terms of the subordination waiver set forth in the FirstBank Settlement. The relative priorities among holders of Allowed Subordinated Notes Claims, and the order in which such Holders are entitled to receive payment of their Allowed Claims, are governed by the relevant Indentures, as modified by the terms of the FirstBank Settlement, and nothing in the Plan is intended to or shall conflict with the contractual subordination and subrogation provisions of such Indentures, as modified by the terms of the FirstBank Settlement, which shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

Class 6 — RGFC Preferred Stock Interests

(a)     Classification: Class 6 consists of all RGFC Preferred Stock Interests.

603415

(b)     Impairment and Voting: Class 6 is Impaired by the Plan. Each Holder of a RGFC Preferred Stock Interest in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)     Treatment: No Holder of RGFC Preferred Stock Interests shall receive any Distribution. ~~The~~ As set forth in the Plan, upon the Effective Date, the RGFC Preferred Stock Interests ~~in Class 6 shall be deemed transferred to the Plan Administrator as of the Effective Date.~~ As set forth in the Plan, ~~immediately thereafter such RGFC Preferred Stock Interests shall be deemed~~ shall be cancelled, terminated and of no further force or effect.

Class 7 — RGFC Common Stock Interests

(a)     Classification: Class 7 consists of all RGFC Common Stock Interests.

(b)     Impairment and Voting: Class 7 is Impaired by the Plan. Each Holder of a RGFC Common Stock Interest in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)     Treatment: No Holder of RGFC Common Stock Interests shall receive any Distribution. ~~The~~ As set forth in the Plan, upon the Effective Date, the RGFC Common Stock Interests ~~in Class 7 shall be deemed transferred to the Plan Administrator as of the Effective Date Immediately thereafter, such RGFC Common Stock Interests shall be deemed~~ shall be cancelled, terminated and of no further force or effect.

**C.     Means for Implementation of the Plan**

**1.     Appointment of a Plan Administrator and a Plan ~~Committee~~ Consultant**

The Plan provides that a Plan Administrator and Plan ~~Committee~~ Consultant shall be appointed on the Effective Date. The Plan Administrator is _____. ~~The Plan Committee is~~ _____ Clifford Zucker, CPA. The Plan Consultant is Wilmington Trust. The duties, powers, and obligations of the Plan Administrator and the Plan ~~Committee~~ Consultant shall be set forth in the Plan Administrator Agreement. Among other things, the Plan Administrator, supervised by

30

603415

and consulting with the Plan ~~Committee~~Consultant, shall be responsible for implementing the Plan, including monetizing or abandoning all of Liquidating RGFC's assets, pursuing or abandoning all Causes of Action, resolving all Claims, and distributing Net Free Cash and Residual Net Free Cash pursuant to the Plan. The Plan Administrator Agreement is included in the Plan Supplement.

## 2. Fees and Expenses of Liquidating RGFC

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees or expenses of Liquidating RGFC or the Plan Administrator, as applicable (including, without limitation, the reasonable fees and expenses of professionals retained by Liquidating RGFC or the Plan Administrator), shall be paid in accordance with the Plan Administrator Agreement without further order of the Bankruptcy Court. ~~The reserve for costs of administering and implementing the Plan and ordinary business expenses of the Plan Administrator and the Wind Down shall in no event exceed $_____ million.~~

## 3. Periodic Reports to Be Filed by Liquidating RGFC

The Plan Administrator shall file periodic reports regarding the administration of Liquidating RGFC's assets, the Distributions made by it and other matters required to be included in such report in accordance with the Plan Administrator Agreement.

## 4. Directors/Officers of the Debtor on the Effective Date

In accordance with the Plan, on the Effective Date, the persons then acting as directors, officers, representatives and/or contract managers of the Debtor shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtor or the Chapter 11 Case. Nothing contained in the Plan shall release the Debtor's officers and directors from claims for actions taken before the Effective Date, including, but not limited to, any claims or actions that may be ~~initiated~~investigated by Wilmington Trust pursuant to the Derivative Standing Order, other than as provided in Article IX of the Plan.

## 5. Plan Administrator

On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtor's officers, directors, representatives, contract managers, and shareholders (subject, at all times, to the oversight of the Plan ~~Committee~~Consultant), and Liquidating RGFC shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator. All property of the Debtor's Estate not Distributed to the Holders of Claims or Interests on the Effective Date shall be transferred to Liquidating RGFC and managed and distributed by the Plan Administrator pursuant to the terms of the Plan Administrator Agreement and the Plan and shall be held in the name of Liquidating RGFC free and clear of all Liens, Claims, charges or other encumbrances against the Debtor and the Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims under the Plan.

As provided in the Plan Administrator Agreement, the Entity chosen to be the Plan Administrator shall have such qualifications and experience to enable it to perform its obligations under the Plan and under the Plan Administrator Agreement. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Plan ~~Committee~~Consultant shall designate another Entity to become Plan Administrator and such Entity will become the successor Plan Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Plan Administrator. The Plan Administrator's reasonable costs and expenses shall be compensated and reimbursed by Liquidating RGFC as set forth in, and in accordance with, the Plan Administrator Agreement.

The Plan Administrator shall be deemed the representative of the Debtor's Estate in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Plan Administrator Agreement, including, without limitation (and except as otherwise provided in the Plan Administrator Agreement), the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without limitation, the right to (a) effect all actions and execute all

agreements, instruments and other documents necessary to implement the provisions of the Plan and the Plan Administrator Agreement, (b) prosecute, settle, abandon or compromise any Causes of Action, (c) make Distributions contemplated by the Plan, (d) establish and administer the Disputed Claims Reserve, (e) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court objections to such claims, and (f) employ and compensate professionals and other agents, including one or more of the Professionals.

### 6. Wind Down and Dissolution of the Debtor

The Plan provides that, after the Effective Date, Liquidating RGFC shall remain in existence for the sole purpose of liquidation, distribution and dissolution. On and after the Effective Date, the Plan Administrator shall make Distributions under the Plan and shall implement the dissolution of Liquidating RGFC and monetization of any assets of Liquidating RGFC pursuant to the Plan Administrator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve Liquidating RGFC. As soon as practicable after the Effective Date, the Plan Administrator shall: (a) take any action reasonably necessary to effectuate the Wind Down; (b) file for Liquidating RGFC, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of Liquidating RGFC under applicable non-bankruptcy law; (c) complete and file all final or otherwise required federal, state and local tax returns of the Debtor or Liquidating RGFC, as applicable, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of Liquidating RGFC, the Debtor or its Estate for any tax incurred during the administration of the Chapter 11 Case, as determined under applicable tax laws; (d) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan; and (e) comply with any regulatory requirements imposed on Liquidating RGFC under applicable law. The filing by the Plan Administrator of a certificate of dissolution on behalf of Liquidating RGFC shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule,

including, without limitation, any action by the stockholders or the board of directors of the Debtor or Liquidating RGFC, as applicable.

**7.      Cancellation of Existing Securities and Agreements; Claims of Subordination**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Subordinated Notes Claims and any RGFC Stock Interest, including the Trust Preferred Subordinated Debentures, and the Trust Preferred Securities, each RGFC Common Stock Interest and each RGFC Preferred Stock Interest shall be deemed automatically canceled, shall be of no further force or effect, whether surrendered for cancellation or otherwise, and the obligations of the Debtor's Estate thereunder or in any way related thereto shall be dischargedterminated.

On the Effective Date, except to the extent otherwise provided in the Plan, any indenture, guarantee or other agreement relating to any of the foregoing, including, without limitation, the Indentures, shall be deemed automatically canceled and terminated, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtor's Estate thereunder shall be dischargedterminated.

As of the Effective Date, the transfer register or ledger maintained by the Indenture Trustees for the Trust Preferred Subordinated Debentures and the Trust Preferred Securities shall be closed, and there shall be no further changes in the record Holders of any Trust Preferred Subordinated Debentures or Trust Preferred Securities.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall continue in effect solely for purposes of (i) allowing the Indenture Trustees to receive Distributions under the Plan on behalf of the Holders of the Trust Preferred Subordinated Debentures and Trust Preferred Securities, (ii) thereafter, allowing the Indenture Trustees to make Distributions to Holders of the Trust Preferred Subordinated Debentures and Trust Preferred Securities, (iii) permitting the Indenture Trustees to maintain any rights and charging Liens they may have against Distributions or property held or collected by the Indenture Trustees for fees, costs

and expenses pursuant to the Indentures, or for indemnification as provided for under the Indentures; (iv) permitting the Indenture Trustees to serve ~~on~~as the Plan ~~Committee~~Consultant after the Effective Date; (v) permitting, but not requiring, the Indenture Trustees to exercise their rights and obligations relating to the interest of their holders pursuant to the applicable Indentures; and (vi) permitting the Indenture Trustees to appear in the Chapter 11 Case. The Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall terminate completely upon completion of all Distributions by the Indenture Trustees to the Holders of the Trust Preferred Subordinated Debentures and the Trust Preferred Securities. The Plan provides that, after the performance by the Indenture Trustees or their respective Representatives of any duties that are required under the Plan, the Confirmation Order, and the Indentures, the Indenture Trustees and their respective Representatives shall be relieved of and released from all obligations arising under the Indentures, and the Indenture Trustees and their respective Representatives shall be fully released and discharged.

The Plan provides that, as a precondition to payment of any Trustee Fees incurred prior to the Effective Date, each Indenture Trustee shall, at any time after the Effective Date and before the date that is thirty (30) days after the Effective Date, submit to Liquidating RGFC or the Plan Administrator, as applicable, and the U.S. Trustee its invoices for payment of such Trustee Fees. Each Indenture Trustee shall also submit a statement reflecting the total amount sought pursuant to such invoice to each other Indenture Trustee. Liquidating RGFC or the Plan Administrator, as applicable, shall, as soon as practicable thereafter, but in no event earlier than ~~twenty~~fourteen (~~20~~14) days after receipt thereof, and unless the Plan Administrator objects thereto or has received an objection thereto from the U.S. Trustee, reimburse the Indenture Trustee in Cash for such Trustee Fees; provided, however, that in exchange for such payment, the Indenture Trustee shall not assert a charging Lien for such payment on any Distribution made to and retained by the Indenture Trustee under the Plan on behalf of the Holders of the Subordinated Notes Claims. In the event any such objection as to reasonableness of the Trustee Fees (which shall be the only basis for objection) is made or received by the Plan Administrator (which objection shall be made in

35

writing and served on the Plan Administrator, the U.S. Trustee, and the Indenture Trustee whose Trustee Fees are the subject of such objection within ~~twenty~~fourteen (~~20~~14) days of receipt of the applicable invoice or statement, but need not be filed with the Bankruptcy Court), Liquidating RGFC or the Plan Administrator, as applicable, shall, as soon as practicable after such objection period has run, reimburse such Indenture Trustee in Cash only for the unobjected to portion of such Trustee Fees. In the event the parties are unable to resolve the objection, the applicable Indenture Trustee may file a motion or application with the Bankruptcy Court in accordance with Article XI.A of the Plan seeking a determination concerning the reasonableness of such Trustee Fees or exercise their charging Lien under the applicable Indenture. Subsequent submissions by an Indenture Trustee of Trustee Fees incurred after the Effective Date may be made from time to time, but no more frequently than monthly, in the same manner (and with the same objection and payment procedures) as set forth above. Nothing in the Plan shall be construed as an agreement by an Indenture Trustee to a waiver of its charging Lien for any amounts not paid pursuant to Article IV.G.5 in the Plan, including, without limitation, any fees and expenses (including the fees and expenses of its professionals) accrued prior to or after the Petition Date. The Plan further provides that in the event an Indenture Trustee chooses to exercise its charging Lien rather than seek payment through the provisions of Article IV.G.5 in the Plan, such Indenture Trustee may do so through a deduction in amounts received in any Distribution and no other filings or requests shall be necessary.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Plan Administrator shall be deemed the holder of all equity interests in Liquidating RGFC on and after the Effective Date solely to effectuate the terms of the Plan, provided, however, that, notwithstanding any provisions to the contrary contained in the Plan or Plan Administrator Agreement, the Plan Administrator shall not sell, convey or otherwise transfer any equity interest in Liquidating RGFC absent: (a) the filing of a motion with the Bankruptcy Court; (b) notice to the Plan ~~Committee~~Consultant; (c) entry of any order by the Bankruptcy Court authorizing any such sale, conveyance or other transfer in accordance with Article IV.E.1 of the Plan; (d) the filing of all appropriate forms by Liquidating RGFC, prior to any such sale, conveyance or